RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0433p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

BANK OF NEW YORK, as former Trustee for
National-Southwire Company Pension Plan,
*Plaintiff,*

SOUTHWIRE COMPANY,
*Defendant-Appellee,*

*v.*

JOHN STEPHEN JANOWICK, GARY ERWIN, and MERL
KANNAPEL, on behalf of themselves and as the
representatives of a class of current and deferred
annuitants of Prudential Group Annuity Contracts
GA 5543 and GA 5542,
*Defendants-Appellants (05-6390),*

CENTURY ALUMINUM COMPANY,
*Defendant-Appellant (05-6456).*

Nos. 05-6390/6456

>

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
No. 03-00020—Joseph H. McKinley, Jr., District Judge.

Argued: September 18, 2006

Decided and Filed: November 22, 2006

Before: BATCHELDER and MOORE, Circuit Judges; COHN, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Leon Dayan, BREDHOFF & KAISER, Washington, D.C., for Appellants. Mark S.
Riddle, GREENEBAUM, DOLL & McDONALD, Louisville, Kentucky, for Appellee. **ON BRIEF:**
Michael C. Merrick, Frank P. Doheny, Jr., DINSMORE & SHOHL, Louisville, Kentucky, Leon
Dayan, Lisa M. Powell, BREDHOFF & KAISER, Washington, D.C., for Appellants. Mark S.

_____

[*] The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by
designation.

1

Riddle, Melissa Norman Bork, Benjamin J. Evans, GREENEBAUM, DOLL & McDONALD, Louisville, Kentucky, for Appellee.

MOORE, J., delivered the opinion of the court, in which COHN, D. J., joined. BATCHELDER, J. (p. 10), delivered a separate dissenting opinion.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  When an insurance company's reorganization yields a pot of money that no one expected or even envisioned, who receives the proceeds?  In short, that is the issue this case requires the court to resolve.

Bank of New York ("BNY") filed this interpleader action to resolve conflicting claims to stock it received from Prudential Insurance Company of America's demutualization, i.e., its reorganization from a mutual insurance company to a stock company.  BNY received the stock as successor-in-interest to the former trustee of the National-Southwire Aluminum Company ("NSA") Pension Plan ("NSA Plan" or "Plan").  The Plan terminated in 1986, and the trustee used the Plan's assets to purchase two group annuity contracts, which satisfied the Plan's ERISA obligations to the employees.

The claimants to the stock are a class of employees ("Employees") of the now-defunct NSA (represented by Defendants-Appellants Janowick, Erwin, and Kannapel), Defendant-Appellee Southwire Company ("Southwire") (the parent company of the former NSA), and Defendant-Appellant Century Aluminum Company ("Century") (the purchaser of the former NSA's assets).  The district court addressed the claims in two phases, first concluding via summary judgment that Southwire's claims were superior to those of the Employees, and next concluding that Southwire's claims trumped Century's.  The Employees and Century both appeal.

Regarding the Employees' appeal, we **REVERSE** the district court's grant of summary judgment to Southwire, as we conclude that both Kentucky law and the nature of demutualization compel the conclusion that the Employees are entitled to the proceeds, and **REMAND** for further proceedings consistent with this opinion.  As to Century's appeal, we **VACATE** the district court's judgment and **DISMISS** Century's appeal as moot, as we conclude that Century could not have purchased from Southwire that which Southwire never owned.

## I. BACKGROUND

### A.  The Pension Plan

In 1970, NSA created the Plan as a defined-benefit pension plan for the Employees, who worked at an aluminum smelting plant NSA operated in Hawesville, Kentucky.  Under a defined-benefit plan, "the benefits to be received by employees are fixed and the employer's contribution is adjusted to whatever level is necessary to provide those benefits."  *Ala. Power Co. v. Davis*, 431 U.S. 581, 593 n.18 (1977).  Thus, NSA paid contributions to the Plan through a funding agent, and the Plan held in trust and managed these funds on behalf of the Employees.

The Plan became governed by ERISA upon ERISA's enactment in 1974.  In December 1986, NSA terminated the Plan.  At that time, Irving Trust Company ("Irving") was the designated Plan trustee.  Consistent with ERISA's requirements, *see* 29 U.S.C. § 1341(b), Irving purchased two group annuity contracts (nos. GA-5542 and GA-5543) from the Prudential Insurance Company of America ("Prudential") for the benefit of the Employees.  These annuity contracts constitute an

"irrevocable commitment[ on behalf of Prudential] to provide all benefit liabilities under the plan." 29 U.S.C. § 1341(b)(3)(A)(i).  *See also* 29 C.F.R. §§ 4001.2, 4041.28(c)(1), 4041.28(d)(1).

After Irving bought the annuity contracts (which cost approximately $7 million) from Prudential, some funds remained in the trust.  Consistent with ERISA, the governing documents of the NSA Plan provided that such surplus funds could revert to NSA once the trustee fully satisfied the plan's obligations to its beneficiaries.  *See* 29 U.S.C. § 1344(d)(1); Joint Appendix ("J.A.") at 157-58 (NSA Plan § 9.2).  NSA received approximately $11.5 million under this provision.  After all of the Plan's assets were distributed, Irving's status as trustee terminated sometime in 1987.  At that point, the Plan was defunct.

## B.  Subsequent Transactions

Starting in the early 1990s, NSA underwent a series of corporate transactions with other companies under the umbrella of NSA's parent corporation, Southwire.  In August 2000, Century agreed to purchase from Southwire the Hawesville plant and assets associated with its business.

## C.  Prudential's Demutualization

At the time Irving purchased the annuity contracts, Prudential was organized as a mutual insurance company under the laws of New Jersey.  "A mutual insurance company has no shareholders and is instead owned by its policyholders."  James A. Smallenberger, *Restructuring Mutual Life Insurance Companies:  A Practical Guide Through the Process*, 49 DRAKE L. REV. 513, 516 (2001).  Those who purchase policies from mutual insurance companies receive both membership interests (e.g., the right to elect directors and the right to receive a proportionate share of the company if it liquidates) and contract rights (i.e., the obligations of the insurance company under the policy).  *Id.* at n.4.

Prior to 1998, New Jersey did not allow insurance companies to organize as stock companies.  J.A. at 476 (NJ Dep't of Banking & Ins. Order No. A01-153 § I.).  New Jersey law changed in 1998, and in December 2000, Prudential's board of directors adopted a plan to demutualize, that is, to reorganize from a mutual insurance company to a stock company.  The demutualization plan was approved by policyholders in July 2001, and within three months, the New Jersey Insurance Commissioner approved the plan.  *Id.*  Prudential's demutualization plan required the new company, Prudential Financial, Inc. ("PFI"), to issue stock to eligible policyholders as consideration for their membership interests in the old company.

In early 2002, PFI issued 35,119 shares of stock to BNY as the successor-in-interest to Irving.  The stock was intended to compensate Irving for the loss of membership interests that it held as the contract-holder of the group annuities purchased to terminate the NSA plan.  However, BNY denied both that it was the contract-holder and that it was entitled to the stock.  Soon, BNY began receiving conflicting demands for the demutualization proceeds when Southwire, the Employees, and Century all asserted entitlement to the stock.  To settle these claims, BNY filed its interpleader complaint on February 3, 2003, naming Southwire, the Employees, and Century all as defendants. The district court had jurisdiction under the minimal diversity requirement of the federal interpleader statute because two of the claimants are diverse, as the Employees are Kentucky residents and Southwire is organized as a Delaware corporation.  28 U.S.C. § 1335(a); *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 530-31 (1967).

**D. Procedural History**

The district court certified a defendant class consisting of the Employees and dismissed BNY from the case, leaving the three claimants as parties to the litigation. It also granted BNY permission to sell the stock and ordered it to deposit the proceeds with the court. Accordingly, BNY deposited approximately $1.3 million with the district court.

The district court proceeded in two phases to settle the claimants' dispute. First, it pitted Southwire against the Employees to determine which of those two parties had the better claim to the demutualization proceeds. On September 29, 2004, it granted summary judgment to Southwire and denied summary judgment to the Employees.

Next, the district court decided whether Century's claim to the proceeds was superior to Southwire's. On August 10, 2005, it granted summary judgment to Southwire and denied summary judgment to Century.

Both the Employees and Century appealed, and their appeals were consolidated for briefing and submission. We have jurisdiction over the Employees' and Century's appeals from the district court's final judgment under 28 U.S.C. § 1291.

## II.  STANDARD OF REVIEW

We review de novo a district court's order granting summary judgment, *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004), and will affirm a grant of summary judgment "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing the district court's decision to grant summary judgment, we must view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.  ANALYSIS

The Employees argue that Southwire never had a right to the demutualization proceeds, and Century argues that it purchased the right to the proceeds when it bought the Hawesville plant from Southwire in 2000. Because we conclude that the Employees are correct, Southwire never could have transferred the interest in the demutualization proceeds to Century.

Ultimately, we conclude that the Employees are entitled to the demutualization proceeds for three separate reasons. First, we conclude that the terms of the annuity contract compel the conclusion that the Employees are now the contract-holders, and thus entitled to the demutualization proceeds. Second, we conclude that under relevant contract principles, we would supply a term to the annuity contracts under *Restatement (Second) of Contracts* § 204 entitling the Employees to unforeseen demutualization proceeds. Finally, we consider the nature of demutualization and conclude that Southwire could not have had any claim to the demutualization proceeds because it never held any ownership interest in Prudential.

**A.  Terms of the Annuity Contract**

Prudential's demutualization plan entitles "Eligible Policyholders"—i.e., the "owners" of eligible policies and annuity contracts, J.A. at 297 (Reorganization Plan § 1)—to demutualization compensation. J.A. at 318 (Reorganization Plan § 7.1(b)). For group annuity contracts, it defines the designated contract-holders as "owners." J.A. at 312 (Reorganization Plan § 5.3). Here, the annuity contracts designate Irving as the contract-holder "as trustee for [the] National-Southwire Aluminum Company Pension Plan." J.A. at 190, 235. Irving's successor (BNY) claims that Irving's

status as contract-holder ceased, presumably when its status as trustee of the NSA Plan terminated in 1988. The demutualization plan does not indicate how shares should be distributed when a policy lacks an owner.[1]

Because the demutualization plan does not resolve the dispute, we turn elsewhere. The Department of Labor ("DOL") has concluded that, in disputes over demutualization proceeds born from an annuity contract purchased to terminate an ERISA plan,[2] the terms of the relevant annuity contracts and state law govern. Dep't of Labor, Office of Pension and Welfare Benefit Programs Op. No. 2003-05A, 2003 WL 1901900 (Apr. 10, 2003). Although the DOL's advisory opinion is not binding on us, it is worthy of "some deference." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (quoting *Reno v. Koray*, 515 U.S. 50, 61 (1995)). Interpretive guidance from administrative agencies that is not the product of formal, notice-and-comment rulemaking is entitled to respect "to the extent that th[e] interpretations have the 'power to persuade.'" *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). The Fifth Circuit applied this standard and deferred to similar guidance from the DOL in *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 296 (5th Cir. 2000). We conclude that the DOL guidance is persuasive because a membership interest in a mutual insurance company is a precondition to any right to demutualization proceeds, and the annuity contract creates such interests. Regardless of whether the annuity contract contemplates the right to demutualization proceeds, previous documents (e.g., the NSA Plan documents) *could not have contemplated* such a right, as they neither created nor encompassed membership interests in Prudential.

We conclude that the terms of the annuity contracts entitle the Employees to the demutualization proceeds. The parties do not press this argument in their briefs, but they have provided copies of the annuity contracts in the Joint Appendix. We address the parties' primary argument, whether we should apply *Restatement (Second) of Contracts* § 204 to supply a missing term to the annuity contracts, *infra* in Part III.B.

As noted above, Prudential's demutualization plan provides that contract-holders, as "owners" of the contracts, are to receive consideration in the form of stock. The annuity contracts dub Irving the contract-holder, but this provision is of no help because, as noted above, Irving's successor claims that it is no longer the contract-holder. The contracts further provide:

> The Contract-Holder at any time may, with the consent of the Prudential, appoint a successor Contract-Holder. . . . [H]owever, . . . if the Contract-Holder notifies the Prudential that it will cease to exist or cease to perform the duties of the Contract-Holder hereunder and no successor Contract-Holder is appointed, this contract shall nevertheless remain in full force and effect . . . .

J.A. at 195 (Annuity Contract No. 5543 at § 1.10), 242 (Annuity Contract No. 5542 at § 3.7). The record contains no indication that Irving appointed a successor contract-holder or notified Prudential prior to 2002 that it would no longer perform the duties of contract-holder. Notably, the contracts are silent regarding who becomes the successor contract-holder in this situation.

---

[1] Although no party so argues, the demutualization plan hints that Prudential should have resolved this dispute by invoking its "Resolution Procedures" once BNY disclaimed entitlement to the demutualization consideration. J.A. at 314 (Reorganization Plan § 5.9). The record contains no indication that Prudential did so.

[2] The "final distribution" of a terminating ERISA plan's assets occurs when the administrator "purchase[s] irrevocable commitments from an insurer to provide all benefit liabilities under the plan, or . . . otherwise fully provide[s] all benefit liabilities under the plan." 29 U.S.C. § 1341(b)(3); 29 C.F.R. § 4041.28(c). Annuities are an example of such "irrevocable commitments." *See* 29 C.F.R. § 4001.2.

"The primary object in construing a contract . . . is to effectuate the intentions of the parties." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. Ct. App. 2002). Kentucky courts[3] have long held that in so doing, it is proper to consider "the circumstances surrounding the parties, and the object" of the contract, in addition to the contract's language. *Owens v. Ga. Life Ins. Co.*, 177 S.W. 294, 298 (Ky. 1915) (quoting *Mitchell v. S. Ry. Co.*, 74 S.W. 216, 217 (Ky. 1903)). "Whe[n] a contract is . . . silent on a vital matter," it is especially appropriate for courts to consider each of these factors, as well as "the subject matter of the contract." *Cantrell Supply*, 94 S.W.3d at 385.

Here, these factors strongly indicate that the parties to the annuity contracts intended for the Employees to step into Irving's shoes as the contract-holders after Irving withdrew. The purpose of the annuity contracts was to provide pension benefits to which the Employees were entitled under the defunct NSA Plan. Accordingly, the Employees are third-party creditor beneficiaries of the contracts. *See Presnell Const. Managers, Inc. v. EH Const., L.L.C.*, 134 S.W.3d 575, 579 n.12 (Ky. 2004) (quoting *Sexton v. Taylor County*, 692 S.W.2d 808, 810 (Ky. Ct. App. 1985)). Other than Prudential, which is not a party to this case, only the Employees have a direct interest in the annuity contracts. By contrast, Southwire is neither a party to, nor a beneficiary of, the contracts. For these reasons, we conclude that the parties' intent in entering the contract was that the Employees would become the contract-holders if Irving were to step down.[4]

## B. *Restatement (Second) of Contracts*

Aside from our analysis of the contract's existing terms, we conclude that the Employees are entitled to the demutualization proceeds under *Restatement (Second) of Contracts* § 204. The annuity contracts say nothing regarding demutualization, which is not surprising as demutualization was not legal in New Jersey (where Prudential was located) when Irving purchased the annuity contracts from Prudential on the Employees' behalf. Because the annuity contracts do not contain a term regarding entitlement to demutualization proceeds, the Employees urge the court to apply *Restatement of Contracts (Second)* § 204 to supply the annuity contracts with a missing term. Section 204 states: "When the parties to a . . . contract have not agreed with respect to a term which

---

[3] The annuity contracts contain choice-of-law provisions selecting New York law. J.A. at 196 (Annuity Contract No. GA-5543 § 1.13), 243 (Annuity Contract No. GA-5542 § 3.11). Notwithstanding these provisions, we believe that, for the following reasons, Kentucky law governs interpretation of the annuity contracts.

As explained above, federal jurisdiction arises under the federal interpleader statute's minimal diversity requirement. *See supra* Part I.C. Accordingly, we apply the choice-of-law provisions of the forum state — here, Kentucky. *Republican Nat'l Comm. v. Taylor*, 299 F.3d 887, 890 (D.C. Cir. 2002). *See also Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir. 2003) (forum state's choice-of-law provisions apply when federal district court has diversity jurisdiction under 28 U.S.C. § 1332).

We have previously determined that under Kentucky law, § 187 of the *Restatement (Second) of Conflict of Laws* governs contractual choice-of-law provisions. *Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 397 (6th Cir. 2000). Section 187 applies the law of the chosen state unless "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice." RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)(a), *quoted in Wallace Hardware*, 223 F.3d at 393 n.9.

The present dispute does not involve any parties domiciled in New York, nor any business conducted in New York. Even the purchase of the annuity contracts, in which the trustee to the pension plan of a Delaware corporation purchased annuity contracts from a New Jersey-based insurer for the corporation's Kentucky employees, involves no substantial relationship to New York. The only basis for the parties' choice is that Irving, which is no longer the contract-holder, was based in New York. For these reasons, under § 187(2)(a), Kentucky law applies. Further, both parties' briefs apply Kentucky law, which indicates that the parties agree that Kentucky law should govern our interpretation of the annuity contracts.

[4] If we were to analyze this issue as supplying a missing term rather than interpreting existing terms, we would reach the same conclusion, employing the same analysis under *Restatement (Second) of Contracts* § 204 as employed in Part III.B.

is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court."

Southwire objects, claiming that Kentucky courts have not endorsed § 204. Although no reported case in Kentucky has applied this provision of the *Restatement*, the Kentucky Supreme Court has applied various other sections of the *Restatement*, which demonstrates that the *Restatement* is generally valid authority in Kentucky. *See, e.g.*, *Hargis v. Baize*, 168 S.W.3d 36, 47 (Ky. 2005) (applying § 195(2)); *Nucor Corp. v. Gen. Elec. Co.*, 812 S.W.2d 136, 144 (Ky. 1991) (§ 354); *id.* at 145 n.2 (§ 350); *Stevens v. Stevens*, 798 S.W.2d 136, 139 (Ky. 1990) (§ 305). Further, Kentucky courts have recognized the principle that "if a contract is silent on a certain point, the law will imply an obligation to carry out the purpose for which the contract was made" — exactly the substance of § 204. *Old Republic Ins. Co. v. Ashley*, 722 S.W.2d 55, 58 (Ky. Ct. App. 1986) (citing *Warfield Nat. Gas Co. v. Allen*, 59 S.W.2d 534 (Ky. 1933)). *Cf. Richardson v. Eastland, Inc.*, 680 S.W.2d 7, 8 (Ky. 1983) ("Where the contract is silent we must interpret the intent of the parties.").[5] Sitting in diversity, our duty is to apply the law of the forum state as announced by its highest court. *West Bay Exploration Co. v. AIG Specialty Agencies of Tex., Inc.*, 915 F.2d 1030, 1034 (6th Cir. 1990). Where the relevant state supreme court has not spoken on an issue, we apply the rule that we believe the state supreme court would apply if it were to decide the case. *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003). Under these circumstances, we believe the Kentucky Supreme Court would employ *Restatement* § 204. Accordingly, so do we.

Section 204's comment *d* instructs courts to apply "community standards of fairness" to determine a term that is reasonable in the circumstances. Here, it is clear that none of the parties expected to receive the demutualization proceeds, which will constitute a windfall to whoever receives them. It is also clear that NSA's decision to terminate the Plan in 1986 relieved it of any risk associated with the Plan—namely, the responsibility to provide whatever level of funding is necessary to yield the fixed level of benefits promised. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999) (noting that under an ongoing defined benefit plan, "the employer typically bears the entire investment risk and—short of the consequences of plan termination—must cover any underfunding as the result of a shortfall that may occur from the plan's investments").[6]

At the same time, the termination of the NSA Plan shifted risk *onto* the Employees. On paper, at least, the Employees are entitled to exactly the same level of benefits under the annuity contracts as they were under the NSA Plan, but crucially, their benefits are no longer guaranteed. Under ERISA, ongoing pension plans are guaranteed by the Pension Benefit Guarantee Corporation (PBGC). *See* 29 C.F.R. §§ 4022.1 *et seq*. Not so for the annuity contracts. If Prudential were to become insolvent and default on its obligations under the annuity contracts, the Employees would be unable to recover the full value of the benefits. Accordingly, the NSA Plan's termination—the very event that necessitated purchase of the annuity contracts—stuck the Employees with a new (and unbargained-for) risk. Applying community standards of fairness, the inserted term should not entitle a party absolved of risk, such as Southwire, to unforeseen demutualization proceeds in

---

[5] Southwire argues that Kentucky courts are reluctant to add terms to contracts. The cases it cites, however, are readily distinguishable, as they concern courts refusing to *alter the existing terms* of the contracts in question. *See, e.g.*, *O.P. Link Handle Co. v. Wright*, 429 S.W.2d 842, 847 (Ky. 1968) (declining "to change the obligations of a contract"); *State Farm Mut. Auto. Ins. Co. v. Hobbs*, 268 S.W.2d 420, 422 (Ky. 1954) (stating that the court cannot "make a contract for the parties or revise the agreement while professing to construe it" and refusing to alter the contract's express termination date).

[6] Contrary to the dissent's conclusion, *Jacobson* in no way forecloses the Employees' claim to the demutualization proceeds. The dissent apparently fails to appreciate the key distinction between the two cases: *Jacobson* involved an *ongoing* retirement plan, whereas the Plan at issue here has been defunct since 1987. Consequently, as explained in Part III.C, the funds at issue could not have belonged to the Plan, and thus could never have been "plan surplus." For this reason, *Jacobson* is not controlling.

preference to the party burdened with additional risk. Accordingly, we supply a term to the annuity contracts entitling the Employees to the demutualization proceeds.[7]

## C.  The Nature of Demutualization

Finally, the nature of demutualization compels the conclusion that Southwire never could have had any right to the demutualization proceeds. As noted above, by definition demutualization "involves a conversion of the mutual policyholders' ownership interest in the old [mutual] company into ownership interest in the form of stock in the new [stock] company." *UNUM Corp. v. United States*, 130 F. 3d 501, 502 (1st Cir. 1997), *cert. denied*, 525 U.S. 810 (1998). Here, no ownership interests materialized until April 1988, when Irving purchased the annuity contracts for the Employees' benefit.[8] NSA did not purchase any annuities from Prudential, and was not the contract-holder. The same is true of Southwire, NSA's parent company. Accordingly Southwire did not hold, and could not have held, any membership interest in Prudential, and thus could not have held any claim to the demutualization proceeds.

Similarly, the ownership interests in Prudential never inured to the NSA Plan. The Plan's trustee (Irving) purchased group annuity contracts from Prudential to effectuate the "final distribution" of the Plan's assets under 29 U.S.C. § 1341(b)(3). This purchase represents the "closeout" of the Plan under 29 C.F.R. § 4041.28. Only then, after the NSA Plan terminated, did any entity (Irving) receive an ownership interest in Prudential. Thus, like Southwire, the NSA Plan could not have held a right to demutualization proceeds. Southwire apparently recognizes as much, as it states that the right to demutualization proceeds does not constitute a "plan asset[]." Southwire Br. at 26.[9] In sum, because neither Southwire nor the NSA Plan ever held an ownership interest in Prudential—a precondition for entitlement to demutualization proceeds—neither could have been entitled to the money at issue.

Southwire disagrees, arguing that the right to demutualization proceeds reverted to NSA along with the $11.5 million in surplus trust funds. Flaws in this argument abound. First, Southwire overlooks that neither NSA nor the NSA Plan ever held any ownership interest in Prudential, as explained above.

---

[7] Were we to attempt to discern the term to which the parties to the annuity contracts would have agreed (the less-favored mode of analysis under § 204's comment *d*), we would reach the same conclusion. As noted above, NSA's decision to terminate the Plan burdened the Employees with a risk for which they did not bargain. Accordingly, we conclude that under the "hypothetical model of bargaining" approach, Irving as the trustee would have demanded that any unanticipated proceeds from an unforeseen insurance company demutualization inure to the Employees to compensate them for this additional risk. Prudential would not have been in a position to favor either the Employees or Southwire, and would not have objected to this term.

[8] The signature pages reflect that the contracts were signed in April 1988, but were effective November 1, 1986.

[9] The Northern District of Illinois concluded in an unpublished opinion that the rights to an unforeseen demutualization may constitute "plan assets." *See Chicago Truck Drivers Union (Indep.) Health & Welfare Fund v. Local 710, Int'l Bhd. of Teamsters,* No. 02 C 3115, 2005 WL 525427 (N.D. Ill. March 4, 2005) (unpublished opinion). Although the case involved a pension plan that had terminated decades ago, the court based its conclusion on two interpretive letters from the Department of Labor that both addressed situations involving ongoing ERISA-covered plans. *See* U.S. Dep't of Labor, Employee Benefits Security Admin. Advisory Op. 2001-02A (Feb. 15, 2001); U.S. Dep't of Labor, Pension & Welfare Benefits Office of Regulations & Interpretations Advisory Op. 92-02A (Jan. 17, 1992).

The court did not address the critical distinction between ongoing and defunct plans and did not provide any explanation of how demutualization proceeds can become an asset of a plan that is defunct and has no assets. Consequently, it appears doubtful that the case was correctly decided.

We reject the Northern District of Illinois's analysis, and instead follow the 2003 DOL opinion, which addresses how to treat demutualization proceeds purchased with the funds of a defunct pension plan. *See* Dep't of Labor, Office of Pension and Welfare Benefit Programs Op. No. 2003-05A, 2003 WL 1901900 (Apr. 10, 2003).

Second, Southwire's argument tortures the language of the Plan documents, which provide that only "funds remaining after the satisfaction of all liabilities" revert to Southwire. J.A. at 463 (NSA Pension Plan ¶ 9.2). Southwire provides no reason for us to accept the counterintuitive proposition that an asserted right to proceeds from an unforeseen, and at the time unlawful, future demutualization of an insurance company was a *fund* remaining in the NSA Plan after Irving purchased the group annuity contracts.

Finally, Southwire's argument misdefines the right at issue. Southwire's position assumes the existence of some abstract right to demutualization proceeds, a right that apparently existed not only at a time predating the demutualization plan, but even when demutualization was not even legal and thus hardly foreseeable. This assumption is infinitely dubious, as the stack of documents regarding the Plan termination, purchase of annuity contracts, and reversion of remaining funds contains nary a word regarding such a right.

In reality, rights to proceeds from a demutualization arise only when a mutual insurance company demutualizes, and in such a situation, the mutual company's demutualization plan defines those rights. With a proper understanding of the right at issue, it is apparent that no right to the Prudential demutualization proceeds could have arisen prior to December 2000, when Prudential announced its plan to demutualize. By that time, the NSA Plan—the only vessel through which Southwire could receive any right to demutualization proceeds—had been defunct for over a dozen years.

In short, Southwire's position is incompatible with the definition of demutualization. This problem does not, however, apply to the Employees' position, which is perfectly consistent with the understanding that no rights to demutualization proceeds arise until the demutualization is announced, absent a clear earlier agreement.

## D.  Century's Appeal

Century argues that it received the right to the demutualization proceeds from Southwire when it purchased from Southwire the Hawesville plant and associated assets in 2000. We have already concluded that Southwire never had any right to the demutualization proceeds. Accordingly, Century could never have received from Southwire any right to or interest in the funds here at issue, as they were not Southwire's to sell.

## IV.  CONCLUSION

For all of the foregoing reasons, we **REVERSE** the district court's order granting summary judgment to Southwire and denying the Employees' motion for summary judgment, and **REMAND** this case for further proceedings consistent with this opinion. Additionally, we **VACATE** the district court's order granting judgment to Southwire and denying Century's motion for summary judgment, and **DISMISS** Century's appeal as moot.

———————————

**DISSENT**

———————————

ALICE M. BATCHELDER, Circuit Judge, dissenting.  I respectfully dissent, as I disagree with the reasoning and the outcome of the majority opinion.  I believe this case is foreclosed by *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 440-41 (1999) (holding that plan participants in a defined benefit pension plan have no claim to the plan's surplus assets).  This case involves a defined benefit plan.  There is no dispute that the annuities were properly calculated and funded to ensure that the employees will receive all of the benefits promised under the plan.  The $1.3 million is surplus; it did not evolve over time into an additional defined benefit or become part of the annuity payments.

The majority provides multiple theories for gifting this money to the employees.  None of these theories, however, changes the basic, irrefutable fact that these employees are only entitled to the benefits defined under the plan, and correspondingly, secured by the annuities.  There is no evidence in the record and we have no basis to assume that these employees will not receive from Prudential all of the benefits to which they are entitled.  I would affirm the decision of the district court and hold that this money represents surplus assets of a defined benefit plan, which was paid into the trust by the employer and must be returned to the employer as trust settlor.