HELENE N. WHITE, Circuit Judge
(dissenting).
I respectfully dissent. The majority concludes that the usage of the word “responsibility” in the Medicare Secondary Payer Act’s (MSP) recovery provision, 42 U.S.C. § 1395y(b)(2)(B)(ii), clearly and unambiguously dictates that a Medicare recipient’s tort recovery from a tortfeasor/primary plan is subject to the Secretary’s claim for reimbursement for the entire amount of Medicare’s conditional payments to healthcare providers on behalf of the recipient, without regard to whether the tort recovery included full payment for the items and services paid for by Medicare. The majority finds this clarity by equating “responsibility” with the amount that must be paid; in other words, if a primary plan is responsible to any degree with respect to an item or service for which Medicare paid, it is responsible for the entire amount Medicare paid, as is any entity to whom the primary payee made a payment in any amount.
The provision states:
A primary plan, and an entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service. A primary plan’s responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient’s compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan’s insured, or by other means. If reimbursement is not made to the appropriate Trust Fund before the expiration of the 60-day period that begins on the date notice of, or information related to, a primary plan’s responsibility for such payment or other information is received, the Secretary may charge interest (beginning with the date on which the notice or other information is received) on the amount of the reimbursement until reimbursement is made (at a rate determined by the Secretary in accordance with regulations of the Secretary of the Treasury applicable to charges for late payments).
42 U.S.C. § 1395y(b)(2)(B)(ii) (emphasis added).
If the amended provision does, indeed, address the question as the majority contends, the consequence is that not only is the Medicare recipient’s recovery subject to the Secretary’s claim for reimbursement for the entire amount paid for medical services, but so too is the tortfeasor (primary plan), and health-care provider who receives any payment from the primary plan; and all three are subject to the Secretary’s independent claim for double damages for the full amount paid. Further, the statute does not distinguish between settlements and judgments; thus, if the statute mandates full recovery, the Secretary’s interpretation of the statute— which permits the recipient/payee to retain the part of the judgment not representing medical costs — is in violation of the express terms of the statute.
Section 1395y(b)(2)(B)(ii) is addressed to the liability of the primary plan, which in this case includes the tortfeasor. The provision also applies to “an entity that re *306 ceives payment from a primary plan,” which could include a Medicare insured, as in this case, or a medical provider that has received a payment. Thus, all three entities, the primary plan, the Medicare recipient and the health-care provider, are subject to the same provision. Further as noted, demonstrated responsibility includes a judgment and a settlement that includes a release.
The majority concludes that if it is demonstrated that the primary plan had a responsibility to make payment with respect to an item or service paid for by Medicare, then the primary plan or an entity receiving payment from the primary plan is liable to the Secretary for the full amount the Secretary paid with respect to the item or service, without regard to the extent of the primary plan’s liability or the amount paid to the entity receiving payment from the primary plan. Having so found, the majority does not explain the statutory basis for limiting the Secretary’s recovery to the settlement amount paid to the recipient by the tortfeasor. If the provision means what the majority says it means, i.e., responsibility means full responsibility for the item or service, then a tortfeasor who settles for less than the amount paid by Medicare is liable to the Secretary for the difference, regardless of the extent of the tortfeasor’s liability for the injuries with respect to which the medical expenses were incurred. Consequently, if Pennyrile had paid Hadden $22,000, it would still be liable to the Secretary for the remaining $60,000. And, if Medicare had paid $250,000 in medical costs, Penny-rile would be liable to the Secretary for the full amount. And, in this case, the Secretary could have sued Pennyrile for the balance of its conditional payments as well as Hadden.[1]
Similarly, under the majority’s interpretation of “responsibility,” a health-care provider receiving partial payment from a tortfeasor/primary plan is required to reimburse the Secretary for the entire amount received from Medicare under section 1395y(b)(2)(B)(i), the conditional payment provision, regardless of the amount received from the tortfeasor/primary plan. One might respond that in interpreting the statute, we must avoid an absurd result, and requiring the health-care provider to reimburse the Secretary in excess of the amount received is an absurd result. That may be so, but some would argue that requiring a severely injured Medicare recipient to repay the Secretary in full even if it means handing over the entire tort settlement is equally absurd.
In contrast to the majority, I conclude the MSP is silent with regard to the issue before us. The “demonstrated responsibility” clause was recently discussed in this Court’s opinion in Bio-Medical Applications of Tennessee, Inc. v. Central States Southeast & Southwest Areas Health & Welfare Fund, 656 F.3d 277, 289-90 (6th Cir.2011), which explained that the clause was added in response to the federal courts’ rejection of the Secretary’s attempts to collect from tortfeasors under section 1395y(b)(2)(B)(ii) and (iii). The provision was intended to make clear that tortfeasors are primary plans subject to the Secretary’s reimbursement claims as long as their liability is demonstrated by some means, including by judgment or settlement. I do not read this amendment as addressing the amount of reimbursement due. It is silent on the issue and does not purport to address it. Historically, Medicare was primary to all coverage except worker’s compensation coverage. Gradually, Congress made other forms of medi *307 cal coverage primary. With the exception of liability insurance, the basis of liability for all sources of payment primary to Medicare was contractual, and the extent of the liability was based on contract, not on the amount Medicare happened to pay.
The concept of demonstrated responsibility arises from the redrafting of the statute to accommodate the Congressional intent that tortfeasors be regarded as primary payors. When tortfeasors pay, Medicare must be reimbursed. It does not follow that Medicare must be reimbursed in an amount greater than it would be reimbursed if the primary payor were a health-care insurance company. Nor does it follow that a tort victim insured by Medicare, who has paid a premium for that coverage, should receive a smaller share of a tort-recovery, or none at all, because the person happened to be insured by Medicare, rather than another health-insurance provider with a subrogation clause. These observations are not addressed to public policy; rather they are addressed to the history of Medicare in the context that the MPA does not speak to the amount of reimbursement.
Chevron deference is not the answer to the MPA’s silence. When reviewing an agency’s interpretation of a statute that it administers, courts typically use the two-step process outlined in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under this framework, if “Congress has directly spoken to the precise question at issue[,] ... the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.” Id. at 842-43, 104 S.Ct. 2778. By contrast, if “the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency’s answer is based on a permissible construction of the statute.” Id. at 843, 104 S.Ct. 2778. An agency’s interpretation of a statute, as expressed in a regulation, is entitled to deference unless it is “arbitrary, capricious, or manifestly contrary to the statute.” Id. at 844, 104 S.Ct. 2778.
Medicare regulations interpret 42 U.S.C. § 1395y(b)(2)(B)(ii) to allow CMS to obtain full reimbursement of conditional payments from a judgment or settlement obtained by the beneficiary against his or her tortfeasor(s). See 42 C.F.R. §§ 411.24(c), 411.37(c). As observed by the majority, in Zinman v. Shalala, 67 F.3d 841, 843 (9th Cir.1995), the Ninth Circuit upheld the regulations as “a rational construction of the statute[, which] is also consistent with the statute’s purpose.” I do not find this single case persuasive. Further, the case preceded the enactment of the language at issue here.
The instant case further differs from Zinman in that Hadden does not challenge the Medicare regulations, but CMS’s policy to apply principles of equitable allocation only in cases where the beneficiary’s claim for damages is adjudicated on the merits. This rule is contained in the MSP Manual, which does not command the same level of deference as agency regulations. As the Supreme Court explained in Christensen v. Harris County,
[Agency] Interpretations [of an ambiguous statute] such as those in opinion letters — like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law — do not warrant Chevron-style deference. Instead, interpretations contained in formats such as opinion letters are “entitled to respect” under our decision in Skidmore v. Swift & Co., 323 U.S. 134, 140 [65 S.Ct. 161, 89 L.Ed. 124 ] (1944), but only to the extent that those interpretations have the “power to persuade,” ibid.
*308 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (emphasis added) (other citations omitted); see also Battle Creek Health Sys. v. Leavitt, 498 F.3d 401, 409 (6th Cir.2007). The MSP Manual is not the product of formal, notice-and-comment rulemaking and, as such, the deference it enjoys hinges on its ability to persuade this Panel of the advantage of treating discounted settlements differently from adjudications on the merits. See Bank of N.Y. v. Janowick, 470 F.3d 264, 269 (6th Cir.2006).
CMS’s arguments in support of its policy are largely culled from the Ninth Circuit’s opinion in Zinman. In particular, CMS argues, “[ajpportionment of Medicare’s recovery in tort cases would either require a factfinding process to determine actual damages or would place Medicare at the mercy of a victim’s or personal injury attorney’s estimate of damages.” Zinman, 67 F.3d at 846 (quoted in CMS Br. at 12-13). There is undoubtedly a risk that settling parties in tort claims that involve medical expenses paid by Medicare could manipulate the proportions of each category of damages and leave Medicare with the smallest slice of the pie.[2] However, the Supreme Court considered and unanimously rejected this very argument in Ahlbom, stating:
ADHS’ and the United States’ alternative argument that a rule of full reimbursement is needed generally to avoid the risk of settlement manipulation is more colorable, but ultimately also unpersuasive. The issue is not, of course, squarely presented here; ADHS has stipulated that only $35,581.47 of Ahlborn’s settlement proceeds properly are designated as payments for medical costs. Even in the absence of such a postsettlement agreement, though, the risk that parties to a tort suit will allocate away the State’s interest can be avoided either by obtaining the State’s advance agreement to an allocation or, if necessary, by submitting the matter to a court for decision. For just as there are risks in underestimating the value of readily calculable damages in settlement negotiations, so also is there a countervailing concern that a rule of absolute *309 priority might preclude settlement in a large number of cases, and be unfair to the recipient in others.
Arkansas Dep’t of Health & Human Servs. v. Ahlborn, 547 U.S. 268, 288, 126 S.Ct. 1752, 164 L.Ed.2d 459 (2006) (footnotes omitted) (emphasis added). The majority correctly observes that Ahlborn involves a different statute with different terminology. However, that distinction has no bearing on the Supreme Court’s reasoning in this regard, which addresses the asserted policy behind the distinction between amounts recovered through settlement and amounts recovered after trial, the same distinction drawn in the Manual.
Further, notwithstanding that a different statute is involved, the Court’s discussion in Ahlbom sheds light on the Court’s view of the arguments put forth by the Zinman court in support of the Regulations. The Court recognized the negative effect of Arkansas’s policy for recovering Medicaid costs on settlements between beneficiaries and tortfeasors. The policy at issue here similarly discourages settlements and may ultimately hinder CMS’s efforts to recover conditional Medicare payments. See generally Rick Swedloff, Can’t Settle, Can’t Sue: How Congress Stole Tort Remedies from Medicare Beneficiaries, 41 Akron L.Rev. 557, 599-602 (2008); Nicole Miklos, Note: Giving an Inch, Then Taking a Mile: How the Government’s Unrestricted Recovery of Conditional Medicare Payments Destroys Plaintiffs’ Chances at Compensation Through the Tort System, 84 St. John’s L.Rev. 305 (Winter 2010).

. Any indemnity agreement that might be included in the tortfeasor’s settlement agreement with the injured party is beside the point.

. Medicare’s position in this case contradicts its behavior in other secondary-payer claims. For instance, CMS regularly reviews and approves settlements in workers’ compensation cases involving future medical expenses. Settlements and awards in workers’ compensation cases frequently include a provision for future medical expenses, i.e., expenses incurred after the settlement or award is finalized. The MSP makes Medicare the secondary payer for such future expenses as well, and CMS has the authority to disregard a settlement if it appears to shift the costs of the injured's future treatment onto Medicare. See generally Norma S. Schmidt, Note: The King Kong Contingent: Should the Medicare Secondary Payer Statute Reach to Future Medical Expenses in Personal Injury Cases, 68 U. Pitt. L.Rev. 469, 476-78 (Winter 2006). The parties to a workers' compensation claim typically enter into a Medicare Set-aside Arrangement ("MSA”) in which "a portion of the settlement is ‘set aside’ and applied specifically to future medical expenses which would otherwise be covered by Medicare.” Id. at 477-78. Before finalizing their settlement, the parties can request that CMS review and approve the MSA amount. Id. at 478. This system "eliminates the risk of a future denial of Medicare benefits, and assures the parties that Medicare’s interests have been reasonably considered.” Id. MSAs have become "standard practice for addressing Medicare’s interests in workers’ compensation settlements.” Id. (internal quotation marks and citation omitted). This system has its drawbacks, notably the difficulty of estimating future healthcare expenses and the added delay of obtaining CMS’s approval of MSA proposals before settlements can be finalized, but CMS has taken steps to make the MSA-approval process more efficient. Id. at 482. In any case, this example shows that CMS need not be "at the mercy” of the victim’s estimate of his damages in cases like this one.