# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 6, 2011             Decided July 8, 2011

No. 10-5433

STEPHEN LAROQUE, ET AL.,
APPELLANTS

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL OF THE UNITED
STATES, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:10-cv-00561)

———

*Hashim M. Mooppan* argued the cause for appellants. With him on the briefs were *Michael A. Carvin*, *Noel J. Francisco*, and *Michael E. Rosman*.

*Linda F. Thome*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Samuel R. Bagenstos*, Deputy Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, and *Diana K. Flynn*, Attorney. *James C. Kilbourne*, Attorney, entered an appearance.

*J. Gerald Hebert* and *Arthur Barry Spitzer* were on the brief for intervenors-appellees.

Before: ROGERS, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: The citizens of Kinston, North Carolina, approved a referendum switching city elections from partisan to nonpartisan. Because Kinston lies in a jurisdiction covered by section 5 of the Voting Rights Act of 1965, the city council had no authority to implement the referendum until precleared by federal authorities, and preclearance has not occurred. A candidate for public office claiming a state-law entitlement to run under the suspended nonpartisan system, together with other plaintiffs, filed suit seeking to enjoin the Attorney General from enforcing section 5 against Kinston. Count one of plaintiffs' complaint contends that section 5, as reauthorized in 2006, exceeds Congress's Fourteenth and Fifteenth Amendment enforcement powers. Count two contends that amendments made to section 5 in 2006 erect a facially unconstitutional racial-preference scheme. The district court dismissed both counts for lack of standing and a cause of action. Concluding that one of the plaintiffs—the candidate for public office—has both standing and a cause of action to pursue count one, we reverse and remand for the district court to consider the merits of that claim. Because plaintiffs' standing with respect to count two raises complex questions unaddressed by the district court and the parties' briefs, we vacate the district court's dismissal of that claim and remand for further consideration consistent with this opinion.

## I.

"Congress enacted the Voting Rights Act of 1965 for the broad remedial purpose of 'rid[ding] the country of racial discrimination in voting.' " *Chisom v. Roemer*, 501 U.S. 380, 403 (1991) (alteration in original) (quoting *South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966)). Section 5, the provision at issue in this case, prohibits "covered jurisdictions"—those with histories of engaging in such discrimination—from implementing any change in "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting" without first obtaining approval from federal authorities. 42 U.S.C. § 1973c(a); *see also id.* § 1973b(b) (setting forth the standards for determining which jurisdictions shall be subject to section 5). Commonly referred to as "preclearance," such approval may be obtained in two ways. First, the covered jurisdiction may seek a declaratory judgment from a three-judge panel of the United States District Court for the District of Columbia that the voting change "neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color." *Id.* § 1973c(a). Second, the jurisdiction may submit the proposed change for review by the United States Attorney General under the same purpose-or-effect test. *Id.*; *see also* 28 C.F.R. § 51.52(a). If the Attorney General fails to object within sixty days, section 5's preemptive effect ends, and the jurisdiction may implement the change. 42 U.S.C. § 1973c(a). If the Attorney General objects, the jurisdiction retains the option of seeking preclearance from a three-judge district court, but section 5 prohibits the jurisdiction from implementing the change until it obtains a judgment from the court that the preclearance requirements are satisfied. *Id.*; *see also Morris v. Gressette*, 432 U.S. 491, 505 n.21 (1977).

Originally "expected to be in effect for only five years," section 5 was "reauthorized . . . in 1970 (for 5 years), 1975 (for 7 years), and 1982 (for 25 years)." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2510 (2009). The Supreme Court upheld section 5's original enactment and those three reauthorizations as permissible exercises of Congress's Fifteenth Amendment enforcement power. *See Katzenbach*, 383 U.S. at 334–35; *see also Nw. Austin*, 129 S. Ct. at 2510. The Court, however, has yet to rule on the constitutionality of Congress's most recent extension, this one enacted in 2006. *See Nw. Austin*, 129 S. Ct. at 2511–13; *see also* Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, § 4, 120 Stat. 577, 580 (reauthorizing section 5 for twenty-five years).

The primary issue in this lawsuit is whether certain private parties have standing to challenge the 2006 reauthorization. To satisfy the minimum standing requirements implicit in Article III's limitation of the federal judicial power to actual "Cases" and "Controversies," U.S. Const. art. III, § 2, plaintiffs must establish "an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal footnote, citations, and quotation marks omitted). Furthermore, this "injury must be fairly traceable to the challenged action of the defendant, and likely to be redressed by a favorable decision." *Ord v. District of Columbia*, 587 F.3d 1136, 1140 (D.C. Cir. 2009) (internal quotation marks omitted).

In addition to these minimum constitutional requirements, courts have recognized prudential limitations on standing not strictly compelled by the Constitution's text.

Most important for our purposes, the Supreme Court has held that "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . . [he] generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). This prudential limitation is meant to avoid "the adjudication of rights which those not before the Court may not wish to assert" and to ensure "that the most effective advocate of the rights at issue is present to champion them." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 80 (1978).

With this legal background in mind, we turn to the facts of the case before us. In a November 2008 referendum, the residents of Kinston, North Carolina, voted by an almost two-to-one margin to switch from partisan to nonpartisan elections for mayor and city council. Absent section 5, Kinston's city council would have had a duty under North Carolina law to amend the city's charter to implement the referendum. *See* N.C. Gen. Stat. §§ 160A-104, -108. But since Kinston lies in Lenoir County, a covered jurisdiction, it may not implement the referendum until precleared by federal authorities.

Pursuant to section 5, Kinston submitted the referendum to the Attorney General, who, through the Justice Department's Civil Rights Division, objected to the referendum in an August 17, 2009, letter. Letter from Loretta King, Acting Assistant Att'y Gen., U.S. Dep't of Justice, Civil Rights Div., to James P. Cauley III, Kinston City Att'y (Aug. 17, 2009) (included at J.A. 42–44). Although not contending that the referendum was infected by a discriminatory purpose, the Division concluded that Kinston had failed to satisfy its burden of proving that the move to nonpartisan elections would have no retrogressive effect on the ability of black voters to elect their preferred candidates.

*See Beer v. United States*, 425 U.S. 130, 141 (1976) ("[T]he purpose of [section] 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."). The Division emphasized that although approximately 65% of Kinston's registered voters are black, "[b]lack voters have had limited success in electing candidates of choice during recent municipal elections." Letter from Loretta King to James P. Cauley III, *supra*, at 1–2. According to the Division, "[t]he success that [black voters] have achieved has resulted from cohesive support for candidates during the Democratic primary (where black voters represent a larger percentage of the electorate), combined with crossover voting by whites in the general election." *Id.* at 2. The Division was concerned that moving to nonpartisan elections would cause black Democratic candidates to lose support from the small number of white voters who out of party loyalty have bucked the racially polarized voting characteristic of Kinston elections. *Id.* It also noted that black candidates would likely lose campaign support and other assistance from the Democratic party if the city moved to nonpartisan elections. *Id.* As a result, the Division concluded, "[r]emoving the partisan cue in municipal elections [would], in all likelihood, eliminate the single factor that allows black candidates to be elected to office." *Id.*

After the city council voted against seeking *de novo* review of the referendum by a three-judge district court, several Kinston residents who supported the referendum and one private membership association filed this suit against the Attorney General on April 7, 2010. They sought a declaratory judgment that section 5, as reauthorized and amended in 2006, is unconstitutional, as well as an injunction prohibiting the Attorney General from enforcing section 5 against

Kinston. The district court permitted six African-American residents of Kinston and the North Carolina State Conference of Branches of the National Association for the Advancement of Colored People to intervene in support of the Attorney General. Significantly for the issues before us, neither Kinston, nor Lenoir County, nor North Carolina is a party to this action.

Plaintiffs' complaint contains two counts. Count one alleges that in reauthorizing section 5, Congress exceeded its power to enforce the Fourteenth and Fifteenth Amendments because the statute "is not a rational, congruent or proportional means to enforce [those Amendments'] nondiscrimination requirements." Compl. ¶¶ 33–34. Count two contends that as a result of amendments Congress made to section 5 in 2006, the section "violates the nondiscrimination requirements of the Fifth, Fourteenth and Fifteenth Amendments." *Id.* ¶ 36. Arguing that plaintiffs lacked standing and a cause of action to bring both counts, the Attorney General and intervenors moved to dismiss.

Although the complaint appears to raise facial challenges to section 5 and as-applied challenges to the constitutionality of the Attorney General's objection, plaintiffs have since made clear that they intend to pursue only their facial challenges. *See LaRoque v. Holder*, 755 F. Supp. 2d 156, 162–63 (D.D.C. 2010); Appellants' Opening Br. 9. This apparent change in position likely reflects the uncertainty over whether courts may ever review the propriety of an Attorney General objection under section 5. Expanding on the Supreme Court's decision in *Morris v. Gressette*, 432 U.S. at 504–05, which held that the Attorney General's failure to object to a proposed voting change is unreviewable, three-judge district courts have refused to entertain challenges to Attorney General objections in declaratory judgment actions initiated

by covered jurisdictions. *See City of Rome v. United States*, 450 F. Supp. 378, 380–82 (D.D.C. 1978); *see also Cnty. Council of Sumter Cnty. v. United States*, 555 F. Supp. 694, 706–07 (D.D.C. 1983). In so doing, these courts have emphasized that through declaratory judgment actions, covered jurisdictions would obtain a *de novo* judicial evaluation of whether they satisfied section 5's preclearance requirements and whether those requirements were constitutional. *See Sumter Cnty.*, 555 F. Supp. at 706; *City of Rome*, 450 F. Supp. at 382 n.3. Given plaintiffs' abandonment of their as-applied challenge to the constitutionality of the Attorney General's objection, we have no need to decide whether *Morris* would bar such a challenge where, as here, the covered jurisdiction *declines* to bring a declaratory judgment action under section 5 following an Attorney General objection. Instead, we need only decide whether plaintiffs enjoy standing and have a cause of action to challenge the constitutionality of section 5 on its face.

Plaintiffs assert three theories of standing: as candidates in Kinston elections, as supporters of the nonpartisan referendum, and as Kinston voters. In support of the first theory—the most important for purposes of this appeal—the complaint alleges that two plaintiffs "intend[] to run for election to the Kinston City Council in November of 2011." Compl. ¶¶ 3–4. Moreover, on the very day plaintiffs filed their complaint, those two plaintiffs "held a press conference to announce [their] candidacies." Nix Decl. ¶ 7; Northrup Decl. ¶ 7. As a registered Republican who would like to run as an unaffiliated candidate, Compl. ¶ 3, one of these plaintiffs, John Nix (the other potential candidate has since decided against running), claims that section 5's preemption of Kinston's nonpartisan referendum injures him in two ways. First, in a system of nonpartisan elections, he could get his name on the general-election ballot more cheaply and easily.

As Nix explains, "under nonpartisan elections, putative candidates need only file a candidacy notice and pay a filing fee," requirements that also apply to partisan elections. Appellants' Opening Br. 6, 19; *see also* N.C. Gen. Stat. §§ 163-291, -294.2. By contrast, under the partisan regime, "candidates must expend additional money and time to win a party primary or obtain signatures from 4% of [qualified] voters." Appellants' Opening Br. 6–7; *see also* N.C. Gen. Stat. §§ 163-291, -296. Second, Nix argues that "the chances of victory for non-Democratic candidates" such as himself "would substantially improve" in nonpartisan elections because "Democratic candidates would lose the benefit of party-line straight-ticket voting and other strategic advantages stemming from their overwhelming registered-voter advantage." Appellants' Opening Br. 7.

In granting the motions to dismiss, the district court raised several concerns about Nix's standing as a candidate in the 2011 election. For one thing, it doubted that Nix had sufficiently alleged injuries that were " 'actual or imminent, not conjectural or hypothetical.' " *LaRoque*, 755 F. Supp. 2d at 174 (quoting *Lujan*, 504 U.S. at 560). According to the district court, Nix's allegation in the April 2010 complaint that he "intend[ed] to run for election to the Kinston City Council in November of 2011," Compl. ¶ 3, was insufficient to justify an inference that Nix actually would run in the 2011 election and thus incur the injuries alleged to flow from Kinston's partisan-elections system, *see LaRoque*, 755 F. Supp. 2d at 173–75. Although acknowledging that Nix had filed an affidavit discussing activities he had taken in support of his candidacy, the district court refused to consider any post-complaint activities because " '[t]he existence of federal jurisdiction . . . depends on the facts *as they exist when the complaint is filed*.' " *Id.* at 174 (alteration in original) (quoting *Lujan*, 504 U.S. at 569 n.4).

The district court also doubted that Nix had alleged the invasion of " 'legally protected interest[s],' as required to establish a constitutional injury in fact." *Id.* at 175 (alteration in original) (quoting *Lujan*, 504 U.S. at 560). This doubt stemmed from the uncontroverted proposition that Kinston's partisan-elections system is constitutionally permissible under the Supreme Court's decision in *Jenness v. Fortson*, 403 U.S. 431, 432 (1971), which rejected First Amendment and Equal Protection Clause challenges to a Georgia law prohibiting a candidate's name from being printed on the general-election ballot unless she either won a party primary or obtained the signatures of "at least 5% of the number of registered voters at the last general election for the office in question." Given *Jenness*, the district court reasoned, Nix was unable to satisfy his burden of establishing that section 5 either conferred an "assertedly illegal benefit" to his campaign opponents or subjected him to an "allegedly *unlawful* ballot access requirement[]." *LaRoque*, 755 F. Supp. 2d at 177, 179 (internal quotation marks omitted).

Ultimately, however, the district court concluded it had no need to resolve whether Nix had alleged actual or imminent injury in fact since it believed that Nix was unable to show that any such injury would likely be redressed through a decision striking down section 5. *See id.* at 179–80, 182–83. The court grounded this conclusion on its determination that the Attorney General's objection nullified Kinston's referendum. *See id.* at 182 ("Kinston's nonpartisan referendum has not been held in abeyance as a result of the Attorney General's objection; it has been nullified."). Even if it invalidated section 5, the court reasoned, the referendum "would remain nullified[] and would need to be re-passed by Kinston voters in order to have any legal effect." *Id.* at 183. Having no way of knowing how the referendum would fare

with voters the second time around, the court concluded that Nix could not "establish 'redressability' as required by Article III." *Id.* According to the district court, this redressability problem, along with several additional concerns, also doomed plaintiffs' other two standing theories—that they had standing as proponents of the November 2008 referendum and as voters in Kinston elections. *See id.* at 169–73, 180–83.

Two additional aspects of the district court's decision are relevant to the issues we face. First, although concluding that plaintiffs lacked standing, the district court rejected the Attorney General's contention that they were unable to show that their alleged injuries were fairly traceable to his enforcement of section 5. According to the district court, the complaint's allegations were sufficient to establish causation because "the Attorney General's refusal to grant preclearance to Kinston's proposed change to nonpartisan elections was a 'but for' cause of plaintiffs' alleged injur[ies]." *Id.* at 182.

Second, the district court explained that even if plaintiffs had standing, it would nonetheless dismiss their complaint under Federal Rule of Civil Procedure 12(b)(6) because they lacked a viable cause of action. Reasoning that plaintiffs' injuries—and thus their claims for relief—flowed only from the Attorney General's objection, the district court believed that plaintiffs' claims necessarily required them to challenge that objection. But according to the district court, *Morris* and its progeny barred judicial review of Attorney General objections, thus depriving plaintiffs of a cause of action. *See id.* at 163, 183–87.

Plaintiffs now appeal. We review *de novo* the district court's dismissal for lack of standing and failure to state a claim upon which relief can be granted. *See Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1105 (D.C. Cir. 2008);

12

*Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006). At this stage of the litigation, we "must accept as true all material allegations of the complaint," drawing all reasonable inferences from those allegations in plaintiffs' favor, *Warth*, 422 U.S. at 501, and "presum[ing] that general allegations embrace those specific facts that are necessary to support the claim," *Lujan*, 504 U.S. at 561 (internal quotation marks omitted). And in assessing plaintiffs' standing, we must assume they will prevail on the merits of their constitutional claims. *See Muir*, 529 F.3d at 1105 ("In reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." (internal quotation marks omitted)). *But see Nw. Austin Mun. Util. Dist. No. One v. Mukasey*, 573 F. Supp. 2d 221, 235–82 (D.D.C. 2008) (upholding the constitutionality of Congress's 2006 reauthorization of section 5), *rev'd on other grounds*, 129 S. Ct. 2504 (2009).

## II.

We begin with the question of whether plaintiffs have standing and a cause of action to pursue the claim, raised in count one, that in reauthorizing section 5 Congress exceeded its Fourteenth and Fifteenth Amendment enforcement powers.

### *Article III Standing*

As explained above, to satisfy the "irreducible constitutional minimum of standing" implicit in Article III's case-or-controversy requirement, plaintiffs must establish an "injury in fact" fairly traceable to the Attorney General's enforcement of section 5 and redressable by a decision striking down that statute. *Lujan*, 504 U.S. at 560–61 (internal quotation marks omitted). Starting with the first of these

requirements—injury-in-fact—we conclude that plaintiff John Nix has sufficiently alleged that he is at risk of suffering "concrete and particularized" injuries to two judicially cognizable interests. *Id.* at 560. First, the partisan-elections regime makes the process of getting on the general-election ballot more costly and time consuming. As Nix argues, courts have recognized that "[s]uch ballot-access requirements impose an 'injury-in-fact,' not only because non-compliance prevents 'candidates' from 'appear[ing] on the . . . ballot,' but also because even compliance requires 'significant amounts of time, money, personnel, and energy,' which are limited 'campaign resources' that could have been 'allocate[d]' elsewhere." Appellants' Opening Br. 19–20 (second and third alterations in original) (quoting *Krislov v. Rednour*, 226 F.3d 851, 856–58 (7th Cir. 2000)); *see also Storer v. Brown*, 415 U.S. 724, 738 n.9 (1974) (holding that candidates had "ample standing" to challenge ballot-access requirements). Second, Nix alleges that Kinston's partisan-elections system injures him by providing a competitive advantage to his Democratic opponents, who enjoy benefits from straight-ticket voting and party loyalty that would largely evaporate in a nonpartisan system, and we have held that such competitive injuries in the electoral arena can confer Article III standing. *See Shays v. FEC*, 414 F.3d 76, 85–87 (D.C. Cir. 2005).

Although the district court doubted that either of these injuries involved the invasion of a "legally protected" interest, *LaRoque*, 755 F. Supp. 2d at 179 (internal quotation marks omitted), the Attorney General does not press that argument on appeal, and for good reason. The very foundation for Nix's claims is that he has a "legally protected" interest under North Carolina law in having the nonpartisan referendum implemented by Kinston's city council, and according to Nix, the only barrier to the vindication of this interest is section 5, which he claims is unconstitutional and thus void. Courts

have "long recognized" that legislatures "may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Shays*, 414 F.3d at 89 (internal quotation marks omitted). We thus disagree with the district court that because Kinston's partisan-elections system is constitutionally permissible under the Supreme Court's decision in *Jenness*, Nix cannot establish a judicially cognizable injury. *See Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007) (noting that the Supreme Court has used the phrases "legally protected interest" and "cognizable interest" interchangeably). Kinston's residents could have voted to retain partisan elections, but since they chose otherwise, Nix has a cognizable interest in reaping the benefits he claims would flow from the nonpartisan system.

On appeal, the Attorney General takes a different tack than the district court, arguing that Nix's alleged harms are too "abstract, contingent, and speculative" to support standing. Att'y Gen.'s Br. 22. Although conceding that the nonpartisan system might "provide Nix easier *access* to the general election ballot," the Attorney General suggests that the system might "impede [Nix's] ultimate electoral *success* by ensuring that he will face a larger number of competitors in the general election than he would in a partisan system." *Id.* at 32. But the Attorney General cites no support for the proposition that Nix's standing can be defeated by the possibility that the partisan system, though imposing greater ballot-access costs, might ultimately improve Nix's chances of electoral success by limiting competition in the general election. Indeed, the argument runs contrary to our decision in *Shays*, which drew on case law regarding "procedural" injuries in holding that candidates may have standing to challenge "illegally structured" campaign environments even if "the multiplicity of factors bearing on elections" prevents

them from establishing "with any certainty that the challenged rules will disadvantage their . . . campaigns." 414 F.3d at 90–91 (internal quotation marks and citation omitted); *see also Lujan*, 504 U.S. at 572 n.7 ("The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy."). Nix argues that he is being forced to compete in an "illegally structured" environment because the threat of the Attorney General's enforcement of section 5, which he claims—and we must assume—is unconstitutional, is preventing the Kinston city council from carrying out its state-law duty to implement the nonpartisan referendum. Given this, our holding in *Shays* means that Nix has no obligation to demonstrate definitively that he has less chance of victory under the partisan than the nonpartisan system.

Even if we take the Attorney General's argument on its own terms, however, Nix's allegation that partisan elections will "substantially harm[] [his] chances for election by . . . making party affiliation a factor in voter[s'] choices," Compl. ¶ 28, is far from "speculative," Att'y Gen.'s Br. 32 n.8. Just look at the Civil Rights Division's objection letter. The Division refused to preclear the nonpartisan system because it worried that black Democratic candidates would suffer from the loss of the electoral benefits associated with party loyalty and straight-ticket voting. The Attorney General's contention that this reasoning "says nothing about the chances of any *particular* Republican candidate in any particular election" is simply wrong. *Id.* After all, the Division's letter does say *something*: it says that Democratic candidates in Kinston tend to receive some votes that they would otherwise not receive absent their party affiliation. True, a particular non-Democratic candidate might be able to overcome this disadvantage based on "factors specific to the candidate, his

or her opponents, the issues salient to the electorate at the time of the election, and mobilization and turnout." *Id.* But that does not change the fact that, all other things being equal, the Democratic label in Kinston tends to benefit Democratic candidates and thus disadvantage their opponents.

Given all this, we think it clear that Nix would have easily satisfied all elements of the injury-in-fact requirement had plaintiffs waited to file their complaint until Nix's campaign was well under way and he had begun collecting signatures to appear on the general-election ballot as an unaffiliated candidate. At that point, there would have been no doubt that his injury was "actual" because he would have been incurring the ballot-access costs associated with partisan elections. In addition, he might have been able to allege that he was currently incurring competitive injury since he was devoting special resources to counteract the partisan advantage his Democratic opponent would enjoy in the general election. The only question, then, is whether, as the district court found, plaintiffs' filing of their complaint while Nix's campaign was still in its infancy destroys his standing because it undermines the "imminence" of the injuries he alleges. We think not.

In the April 2010 complaint, Nix alleged that he "intend[ed] to run for election to the Kinston City Council in November of 2011," Compl. ¶ 3, and on the same day plaintiffs filed their complaint, he held a press conference announcing his candidacy, Nix Decl. ¶ 7; *see also Haase v. Sessions*, 835 F.2d 902, 907 (D.C. Cir. 1987) (noting that a plaintiff "can freely augment his pleadings with affidavits," such as the affidavit Nix filed discussing, among other things, his press conference, to establish the plaintiff's standing). The district court nonetheless appears to have been concerned that since Nix had "never before held office" and at the time of the

complaint had taken few steps to establish his candidacy, *LaRoque*, 755 F. Supp. 2d at 175, the risk he would change his mind was unacceptably high, thus raising the possibility that the court would end up "render[ing] an advisory opinion in 'a case in which no injury would have occurred at all,'" *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 500 (D.C. Cir. 1994) (quoting *Lujan*, 504 U.S. at 564 n.2). But when plaintiffs filed their complaint, the election in which Nix planned to run was only nineteen months away, a far cry from the more than four-year gap that sank Senator Mitch McConnell's standing in *McConnell v. FEC*, 540 U.S. 93, 225–26 (2003) (holding that Senator McConnell lacked standing to challenge a provision of the Bipartisan Campaign Reform Act of 2002 ("BCRA") that at earliest would have affected him in his 2008 reelection campaign), *overruled on other grounds by Citizens United v. FEC*, 130 S. Ct. 876 (2010). In our view, Nix's allegation that he intended to run in the November 2011 election and his public announcement at the press conference sufficiently establish the "substantial probability" of imminent injury required for Article III standing. *Chamber of Commerce v. EPA*, No. 09-1237, 2011 WL 1601753, at *6 (D.C. Cir. Apr. 29, 2011) (internal quotation marks omitted); c*f. Shays*, 414 F.3d at 92 (holding that incumbent congressmen subject to two-year election cycles had standing to challenge the FEC's implementation of certain provisions of BCRA).

Indeed, as Nix argues, a contrary holding "would place courts and candidates in an untenable position." Appellants' Opening Br. 31. While federal litigation can take months, even years, Nix contends, and neither the Attorney General nor intervenors dispute, that campaigns for local offices rarely span multiple years. *See Burlington N. R.R. Co. v. STB*, 75 F.3d 685, 689–90 (D.C. Cir. 1996) (noting that since federal litigation often takes at least two years to resolve, agency

orders "of less than two years' duration ordinarily evade review" for purposes of the "capable of repetition, yet evading review" exception to mootness (internal quotation marks omitted)); *see also* Appellants' Opening Br. 31–32 ("[M]ost political campaigns do not begin two years before the election, and especially not campaigns for local offices by novice candidates."); Nix Decl. ¶ 10 (stating that Nix would not begin gathering signatures to appear on the general-election ballot as an unaffiliated candidate until September 23, 2010, "because signatures are due on September 23, 2011, and are only valid for a year"). As a result, were we to agree with the district court that Nix lacked standing to sue because his campaign was still at an early stage when plaintiffs filed their complaint, we would essentially require novice political candidates like Nix either (1) to waste resources by accelerating their campaigns to confirm their standing, or (2) to delay suing until the eve of election, thus injecting uncertainty into campaigning and imposing burdens on the courts by requiring them to expedite the litigation. Nothing in Article III requires us to impose such an undesirable set of options on candidates and courts. Given our conclusion that Nix's concrete plan to run in the November 2011 election suffices to establish the imminence of his alleged injuries, we have no need to reach plaintiffs' alternative argument that the district court should have considered activities described in Nix's affidavit occurring after the date the complaint was filed.

Turning to the issue of causation, we agree with Nix that his alleged injuries are fairly traceable to the Attorney General's insistence on enforcing section 5's preclearance requirement. Absent section 5 and the threat that the Attorney General would enforce it by, for example, seeking to enjoin any attempted implementation of a non-precleared election change, *see* 42 U.S.C. § 1973j(d); *Allen v. State Bd. of*

*Elections*, 393 U.S. 544, 561 (1969), there is no reason to doubt that the Kinston city council would carry out its state-law duty to implement the referendum, *see Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 941 (D.C. Cir. 2004) (noting that a plaintiff is not deprived of standing by the possibility that a third party might take "the extraordinary measure of continuing [its] injurious conduct in violation of the law").

Against this reasoning, the Attorney General presents two arguments. First, relying on the Supreme Court's holding in *McConnell* that political candidates were unable to claim competitive injury from increased campaign-contribution limits because the candidates, like their competitors, could take advantage of the increases, the Attorney General contends that Nix lacks standing because his alleged injuries are traceable not to the Attorney General's insistence on enforcing section 5 but instead to Nix's "personal choice." *McConnell*, 540 U.S. at 228. According to the Attorney General, since Kinston's current election system permits Nix to "choose whether to run for office as either a partisan or a nonpartisan candidate," any "disadvantages he may suffer as a result of that choice are caused by his own action, not the operation of Section 5, the Attorney General's objection, or Kinston's election system." Att'y Gen.'s Br. 38. We disagree. Unlike the candidates in *McConnell*, who could cure their "fundraising disadvantage" by exploiting BCRA's increased contribution limits, *McConnell*, 540 U.S. at 228 (internal quotation marks omitted), Nix could avoid the ballot-access costs associated with Kinston's partisan-elections system only by abandoning his aspiration of appearing on the general-election ballot. This option, however, is available to all candidates challenging ballot-access requirements, yet that has hardly stopped the Supreme Court from holding that political candidates have "ample standing" to bring such

challenges. *Storer*, 415 U.S. at 738 n.9. Similarly, Nix could avoid the alleged electoral disadvantages of the partisan system only by running as a Democrat. But given Nix's First Amendment right to freedom of association, that option cannot possibly provide a basis for depriving him of standing. *See Williams v. Rhodes*, 393 U.S. 23, 30 (1968) (explaining that the First Amendment protects "the right of individuals to associate for the advancement of political beliefs"); *see also Storer*, 415 U.S. at 738 n.9, 745–46 (holding that candidates had standing to challenge requirements for appearing on the general-election ballot as independents even though they could have chosen to run in a party primary).

As a second line of defense, the Attorney General argues that since Kinston's city council declined to seek a declaratory judgment that the change to nonpartisan elections had neither a discriminatory purpose nor a discriminatory effect, "Kinston's decision to continue its partisan election system was . . . 'the independent action of [a] third party not before the court,' that is, the City of Kinston." Att'y Gen.'s Br. 39 (alteration in original) (internal citation omitted) (quoting *Lujan*, 504 U.S. at 560). This argument also fails. As an initial matter, case law makes clear that private parties who otherwise satisfy the requirements for standing may challenge federal preemption of state actions even if state officials have abandoned their legal challenges. *See, e.g.*, *Schulz v. Williams*, 44 F.3d 48, 52–53 (2d Cir. 1994) (holding that a political party chairman had standing to appeal a district court decision striking down state election laws even though the state board of elections had decided against appealing). Furthermore, although causation and redressability are "ordinarily 'substantially more difficult' to establish" where, as here, a plaintiff challenges the government's regulation of a third party (i.e., the City of Kinston), *Lujan*, 504 U.S. at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)), this is no

ordinary case. As we have held, a party may have "standing to challenge government action that permits or authorizes third-party conduct that would otherwise be illegal in the absence of the Government's action"—precisely what Nix seeks to do. *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 940. He alleges that absent section 5, the Kinston city council would have a state-law duty to implement the voter referendum—an interpretation of North Carolina law that neither the Attorney General nor intervenors challenge. *See* N.C. Gen. Stat. §§ 160A-104, -108. Nix's alleged injuries are thus fairly traceable to the Attorney General "because the intervening choices of" the Kinston city council "are not truly independent of" the Attorney General's insistence on enforcing section 5. *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 940–41.

Moving on to redressability, the Attorney General wisely refrains from defending the district court's holding that even if Nix satisfies the other requirements for Article III standing, his alleged injuries would not be redressed by a judgment declaring section 5 unconstitutional and enjoining the Attorney General from enforcing it. The premise underlying this conclusion—that the Attorney General's objection "nullified" Kinston's referendum, *LaRoque*, 755 F. Supp. 2d at 182–83—suffers from two flaws. First, it misconstrues section 5. That statute provides that "no person shall be denied the right to vote for failure to comply" with a new electoral law "unless and until" the law is precleared by either the Attorney General or the District Court for the District of Columbia. 42 U.S.C. § 1973c(a). By objecting to an electoral change, the Attorney General in no way nullifies the proposed change. Instead, he simply fails "to . . . end" section 5's "postpon[ement]" of "the implementation" of that change. *Morris*, 432 U.S. at 504; *see also Nw. Austin*, 129 S. Ct. at 2511 ("Section 5 . . . suspend[s] *all* changes to state election

law . . . until they have been precleared by federal authorities . . . ."). As Nix points out, if Attorney General objections nullified proposed electoral changes, then even covered jurisdictions would lack standing to challenge section 5's constitutionality after receiving such objections. *See* Appellants' Opening Br. 41. That, however, would conflict with the Supreme Court's decision in *City of Rome v. United States*, 446 U.S. 156, 161–62, 173–83 (1980), which reached the merits of constitutional challenges raised by a covered jurisdiction whose electoral changes the Attorney General had refused to preclear.

Second, the district court's analysis overlooks the fact that if, as Nix alleges, section 5 is unconstitutional, the Attorney General's actions pursuant to that unconstitutional statute would be void. And the general rule is "that a void act cannot operate to repeal a valid existing statute," meaning that the existing statute "remains in full force and operation as if the repeal had never been attempted." *Conlon v. Adamski*, 77 F.2d 397, 399 (D.C. Cir. 1935). This rule is well illustrated by the Supreme Court's decision in *Clinton v. City of New York*, 524 U.S. 417 (1998), which held unconstitutional the Line Item Veto Act. Under the district court's reasoning in the case before us, plaintiffs in *Clinton* would have lacked standing because the President's cancellation of the budgetary provisions at issue in that case would have "nullified" those provisions despite the unconstitutionality of his actions. Yet the Supreme Court squarely held that plaintiffs had standing because the budgetary provisions the President had purportedly canceled would have benefitted them. *See id.* at 429–36. The Court nowhere suggested that Congress would have to re-pass the canceled provisions for them to be operative. Likewise here—the Attorney General's *ultra vires* action under an allegedly unconstitutional federal statute could hardly deprive Nix of standing.

In sum, a judgment declaring section 5 unconstitutional would remove the federal barrier to the implementation of the nonpartisan referendum, and absent that barrier, there is no reason to believe that the Kinston city council would refrain from carrying out its state-law duty to put the referendum, which the Attorney General's objection did not and could not nullify, into effect. As a result, Nix has established that his alleged injuries would likely be redressed by a decision in his favor.

### *Prudential Standing*

Having concluded that Nix satisfies all the prerequisites for Article III standing with respect to count one, we turn to the Attorney General's contention that Nix nonetheless lacks prudential standing to assert the rights of the City of Kinston and the State of North Carolina against federal interference "with a specific aspect of state sovereignty"—i.e., control over municipal elections. Att'y Gen.'s Br. 39–40 (internal quotation marks omitted). In support, the Attorney General relies on the prudential principle, discussed above, that "even when [a] plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499.

The Attorney General's argument, however, is foreclosed by *Bond v. United States*, No. 09-1227 (U.S. June 16, 2011), which the Supreme Court issued following oral argument in this case. In *Bond*, the Court held that a criminal defendant charged with attempting to poison her husband's paramour had standing to challenge the federal statute under which she was indicted on the grounds "that, by enacting it, Congress exceeded its powers under the Constitution, thus intruding

upon the sovereignty and authority of the States." *Id.* at 1. The Court reiterated that our federal system's allocation of power between the national government and the states is meant to protect not only "the integrity, dignity, and residual sovereignty of the [s]tates," but also "individual liberty." *Id.* at 9; *see also New York v. United States*, 505 U.S. 144, 181 (1992) ("[T]he Constitution divides authority between federal and state governments for the protection of individuals."). As a result, where, as here, an individual "is a party to an otherwise justiciable case or controversy, [he] is not forbidden to object that [his] injury results from disregard of the federal structure of our Government." *Bond*, No. 09-1227, slip op. at 13–14; *see also id.* at 10 ("Fidelity to principles of federalism is not for the States alone to vindicate."). Of course, a litigant is in no way freed from familiar constitutional and prudential standing requirements merely because he challenges a law that he claims "upset[s] the constitutional balance between the National Government and the States." *Id.* at 10, 13. Certainly, if Nix lacked a concrete, particularized, redressable injury and was instead seeking only to vindicate "the right, possessed by every citizen, to require that the Government be administered according to law," he would have no standing to challenge section 5. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 482–83 (1982) (internal quotation marks omitted); *see also Bond*, No. 09-1227, slip op. at 13. But since Nix otherwise satisfies the requirements for standing, he may through this lawsuit pursue his "direct interest" in the invalidation of a statute that he contends exceeds Congress's enumerated powers and thus endangers the liberty-protecting structure of our federal system. *Bond*, No. 09-1227, slip op. at 10.

Given our conclusion that Nix has both Article III and prudential standing to argue that Congress's 2006 reauthorization of section 5 exceeded its Fourteenth and

Fifteenth Amendment enforcement powers, and given that Nix and the other plaintiffs all rely on the same arguments against section 5's constitutionality, we have no need to decide whether those other plaintiffs also have standing to raise the claim asserted in count one. *See Comcast Corp. v. FCC*, 579 F.3d 1, 6 (D.C. Cir. 2009) ("[I]f one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case." (internal quotation marks omitted)). We thus turn to the question of whether Nix has a cause of action to pursue that claim.

## *Cause of Action*

Neither the Attorney General nor intervenors contest Nix's argument that courts may recognize nonstatutory causes of action for private parties to seek declaratory and injunctive relief against the enforcement of statutes that allegedly venture beyond the bounds of Congress's enumerated powers. This implicit concession of the validity of Nix's argument makes sense given the Supreme Court's recent decision in *Free Enterprise Fund v. Public Co. Accounting Oversight Board*, 130 S. Ct. 3138, 3151 n.2 (2010), which recognized a nonstatutory cause of action for an accounting firm to seek declaratory and injunctive relief against the Public Company Accounting Oversight Board on the grounds that the statute creating the Board violated the Appointments Clause and impermissibly encroached on the President's authority to remove Executive Branch officials. Although the case before us involves the separation of powers between the federal government, on the one hand, and the states and the people, on the other, instead of between Congress and the President, we fail to see why a different result would be required merely because vertical rather than horizontal separation of powers is at issue. *See Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (analogizing between "the separation and independence of the

coordinate branches of the Federal Government" and the "balance of power between the States and the Federal Government"); *see also Bond*, No. 09-1227, slip op. at 10–12 (relying on the same analogy in holding that a litigant who otherwise satisfies the requirements for standing may "challenge a law as enacted in contravention of constitutional principles of federalism").

The only question, then, is whether the Attorney General and the district court are correct that Nix has no nonstatutory cause of action because his claim necessarily requires judicial review of the Attorney General's objection, which case law suggests might be unreviewable under any circumstances. *See supra* pp. 7–8 (discussing *Morris* and related precedent). As the Attorney General acknowledged at oral argument, however, Nix and the other plaintiffs have made it abundantly clear that they have no intention of challenging that objection. *See* Oral Arg. Tr. at 32:15–33:7. To the contrary, although their complaint seems to raise both as-applied and facial challenges to section 5, plaintiffs have repeatedly confirmed that they are now arguing only that section 5, as reauthorized in 2006, is *facially* unconstitutional. *See, e.g.*, Appellants' Opening Br. 9. According to plaintiffs, their injuries flow not from the Attorney General's objection, but rather from section 5's allegedly unconstitutional preemption of voting changes that have failed to receive preclearance. True, the Attorney General could have terminated section 5's preemption of the nonpartisan referendum by preclearing it. But we agree with plaintiffs that "[n]either law nor logic requires [them] to challenge the Attorney General's failure to alleviate the statutorily imposed injury[] in order to challenge Congress' infliction of that injury in the first place." *Id.* at 45–46.

Because section 5 is preventing the Kinston city council from carrying out its state-law duty to implement the

nonpartisan referendum, Nix has both standing and a cause of action to seek declaratory and injunctive relief against the Attorney General—the Executive Branch official charged with enforcing section 5—on the grounds that the provision exceeds Congress's enumerated powers.

## III.

This brings us finally to whether plaintiffs have standing to assert the equal protection challenge raised in count two. Even if the 2006 reauthorization of section 5 as a whole did not exceed Congress's Fourteenth and Fifteenth Amendment enforcement powers, plaintiffs allege, the addition of subsections (b)–(d) to section 5 "transform[ed]" the provision into an unconstitutional "race-based minority-entitlement scheme." Pls.' Mem. in Opp'n to Def.'s Mot. to Dismiss 1, July 1, 2010.

Congress added two of these subsections, (b) and (d), in response to the Supreme Court's decision in *Georgia v. Ashcroft*, 539 U.S. 461, 480 (2003), which held that in determining whether a proposed electoral change has a retrogressive effect, federal authorities should not focus solely on whether the change reduces minorities' ability to elect their preferred candidates. *See* H.R. Rep. No. 109-478, at 68–72 (2006). Instead, the Court ruled, they should consider "the totality of the circumstances" and especially whether a plan that decreases minorities' ability to elect their preferred candidates in some districts has the offsetting benefit of increasing their political influence in other districts. *See Georgia*, 539 U.S. at 480–85. Essentially overruling *Georgia v. Ashcroft*, Congress added subsections (b) and (d) to section 5, which make clear that the section 5 inquiry should focus on whether the proposed change "has the purpose of or will have the effect of diminishing the ability of any citizens of the United States on account of race or color . . . to elect their

preferred candidates of choice." 42 U.S.C. § 1973c(b); *see also id.* § 1973c(d) ("The purpose of subsection (b) . . . is to protect the ability of such citizens to elect their preferred candidates of choice."). According to plaintiffs, these amendments establish an unconstitutional "floor for minority electoral success in all covered jurisdictions until 2031, regardless of whether minorities in those jurisdictions have an equal opportunity to elect their preferred candidates or to participate in the political process under the voting change, and regardless of whether there are compelling reasons supporting the voting change." Compl. ¶ 25.

Congress added the other challenged amendment, subsection (c), in response to another Supreme Court decision, *Reno v. Bossier Parish School Board*, 528 U.S. 320 (2000). *See* H.R. Rep. No. 109-478, at 66–68. In that case, the Court held that nothing in section 5 "prohibit[s] preclearance of a redistricting plan enacted with a discriminatory but nonretrogressive purpose." *Bossier Parish*, 528 U.S. at 341. In other words, the Court ruled that section 5 permits preclearance of an electoral provision that, though motivated by racial animus, has neither the purpose nor the effect of reducing minorities' current electoral power. Congress effectively overruled this holding by adding subsection (c), which provides that the term "purpose" in section 5 means "any discriminatory purpose." 42 U.S.C. § 1973c(c). Given the Justice Department's alleged history of objecting to voting changes that fail to "increase minority-preferred candidates' success to the maximum practicable extent," plaintiffs claim that subsection (c) constitutes "an implicit command for covered jurisdictions to engage in race-based voting practices and procedures" to maximize minorities' electoral strength. Compl. ¶ 26.

Significantly, plaintiffs do not contest the constitutionality of the pre-2006 preclearance standards articulated in *Georgia v. Ashcroft* and *Bossier Parish*. Instead, they challenge only Congress's "substantive expansion of the preclearance standard" through the addition of subsections (b)–(d). Appellants' Opening Br. 8 (emphasis in original removed).

Plaintiffs' standing to raise the equal-protection claim asserted in count two receives relatively little attention in both the district court's opinion and the parties' appellate briefs. As a result, many questions relevant to this very difficult issue remain unaddressed, or at least have yet to be addressed in a manner commensurate with their complexity.

For example, plaintiffs allege that they have been injured by section 5's " 'postpon[ement] [of] the implementation of [the] validly enacted [referendum]' in furtherance of Congress' minority-preferring regime." Appellants' Reply Br. 30 (third and fourth alterations in original) (quoting *Morris*, 432 U.S. at 504). But section 5's preemptive provision appears in subsection (a), not subsections (b)–(d), thus presenting the following questions: even were we to declare subsections (b)–(d) unconstitutional, would we sever and strike down only those subsections, leaving subsection (a) untouched? And if so, what would happen to the Kinston referendum and the Attorney General's decision to refuse preclearance, given that the preemption and the preclearance decision both occurred under a statutory scheme that included the allegedly defective subsections (b)–(d)? *See Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) (relying on *INS v. Chadha*, 462 U.S. 919, 931–36 (1983), in holding that severability can be relevant to the issue of standing).

These questions are complicated by the fact that only Kinston and its officials, not plaintiffs, are authorized to submit electoral changes for preclearance. *See* 42 U.S.C. § 1973c(a); 28 C.F.R. § 51.23. So far, Kinston has neither joined this lawsuit nor exercised its right to request reconsideration of the Attorney General's objection. *See* 28 C.F.R. § 51.45. So what is the remedy the plaintiffs seek with respect to count two, and does the redressability of their alleged injuries depend on whether Kinston will seek reconsideration of the Attorney General's preclearance decision? *See Lujan*, 504 U.S. at 562 ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish." (internal quotation marks omitted)). Given these considerations, can plaintiffs satisfy the causation and redressability requirements of Article III standing with respect to count two?

Another question is whether, as the district court believed, *see LaRoque*, 755 F. Supp. 2d at 185–87, and as the Attorney General argues on appeal, Att'y Gen.'s Br. 46, plaintiffs' count-two claim requires review of the Attorney General's objection—something plaintiffs disclaim any intention of seeking given their fear of running afoul of *Morris* and its progeny. If the answer is no—because plaintiffs are bringing only a facial challenge, *see* Appellants' Reply Br. 30—then have they met the requirement that litigants claiming injury from a racial classification establish that they "personally [have been] denied equal treatment by the challenged discriminatory conduct"? *United States v. Hays*, 515 U.S. 737, 743–44 (1995) (internal quotation marks omitted).

Without meaningful briefing on these issues, we are hesitant to decide plaintiffs' count-two standing. Of course,

we could ask for additional briefing. But that would take time, and as plaintiffs' repeated requests for us to expedite this litigation so that it can be resolved before the November 2011 election indicate, time is of the essence. Given this, and given that plaintiffs themselves characterize count two as a fallback position, *see* Oral Arg. Tr. at 13:2–4, 15:11–15 (characterizing count two as an "alternative claim[]" that plaintiffs brought in case they lose on count one), we are reluctant to consume precious time resolving plaintiffs' standing to bring count two—time the district court could instead devote to considering the merits of plaintiffs' principal argument, asserted in count one, that Congress's 2006 reauthorization of section 5 exceeded its Fourteenth and Fifteenth Amendment enforcement powers.

Therefore, exercising our discretion to decline to reach issues neither addressed by the district court nor adequately briefed on appeal, we shall vacate the district court's dismissal of count two and remand so that court may, in the first instance, consider the issues we have identified with respect to that count while also addressing the merits of count one. *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 783 F.2d 237, 251 (D.C. Cir. 1986) (noting that federal appellate courts have discretion to remand "purely legal" issues unaddressed by the district court and inadequately briefed on appeal). In doing so, we emphasize that nothing in this opinion should be read as expressing definitive views about how the questions we have posed should be answered. Moreover, we recognize that plaintiffs' assertion of standing with respect to count two might raise other issues beyond those we have identified. That said, we expect that by addressing the questions we have raised, the parties will help the district court, and ultimately this court, (1) identify the precise theories on which plaintiffs rely in support of their count-two standing, and (2) understand

how those theories relate to existing precedent and what implications the theories might have for future cases.

## IV.

For the foregoing reasons, we reverse the district court's dismissal of count one, vacate its dismissal of count two, and remand for further proceedings consistent with this opinion.

*So ordered.*