Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 15, 2006      Decided December 15, 2006

No. 05-7140

MICHAEL STEWART AND ILENE BERGENFELD,
AS TRUSTEES OF THE PHILIP A. STEWART IRREVOCABLE
TRUST, ON BEHALF OF THEMSELVES AND ALL OTHER PERSONS
SIMILARLY SITUATED,
APPELLANTS

v.

NATIONAL EDUCATION ASSOCIATION AND
NATIONAL EDUCATION MEMBERS INSURANCE TRUST,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 02cv02014)

———

*James M. Pietz* argued the cause for appellants.  With him on the briefs were *Philip Friedman*, *Michael P. Malakoff*, *Marc A. Wites*, and *Alejandro Perez*.

*Leon Dayan* argued the cause for appellees.  With him on

the brief were *Douglas L. Greenfield* and *Karen M. Wahle*. *Julia P. Clark* entered an appearance.

Before: SENTELLE and ROGERS, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: This case concerns a transfer of money from the Prudential Life Insurance Company to the National Education Association Members Insurance Trust ("NEA Trust") when Prudential converted from a mutual life insurance company—where the insured mutually own the company—into a stock life insurance company. On appeal from the dismissal of the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), the trustees of the estate of Philip A. Stewart ("Stewart") contend that he is entitled to benefit from the demutualization. Stewart maintains that the district court erred in ruling that the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, applied to the NEA insurance benefit plan and, alternatively, that he failed to state a cause of action under ERISA for benefits and for breach of fiduciary duty. In view of the allegations in the amended complaint, Stewart is estopped from arguing that ERISA does not apply to the NEA insurance benefit plan. Further, Stewart identifies no term of the Group Contract that entitles him to receive the demutualization proceeds, which represent the capitalization of future dividends, as a benefit. Additionally, because Stewart does not allege that he was entitled to the demutualization proceeds as a dividend, but only that no provision in the Group Contract allowed the NEA Trust to take control of the insureds' alleged equity interest in the demutualization proceeds, he cannot show that the NEA or NEA Trust (collectively, "the NEA") breached a fiduciary duty under ERISA. Accordingly, we affirm.

**I.**

The NEA is a national organization of education professionals. In 1978, it established a Members Insurance Plan ("Plan") to operate voluntary programs providing benefits in the event of a death, accident, sickness, disability, or other occurrence affecting participants or their families, either through self-funding the benefits or by buying group insurance policies. At the same time, the NEA set up the NEA Trust to hold the Plan's assets. The Plan is governed by a "Plan Document" and the Trust is governed by a "Trust Agreement." The NEA Trust entered into a group life insurance contract ("Group Contract") with Prudential to provide insurance to participating NEA members ("Member-Insureds"). The Group Contract incorporates a Group Insurance Certificate and Member-Insureds' individual applications and provides that the NEA Trust is the contract holder.

NEA members are eligible for life and accident insurance coverage under the Group Contract, subject to approval by Prudential. Under the terms of the Group Contract, Prudential fixes the premium amount, which the Member-Insured pays to the NEA Trust, which in turn makes a group payment (equal to the sum of those premiums) to Prudential. Claims are submitted directly to Prudential. In recognition of the ownership stake of Prudential's policyholders, the Group Contract further provides that "Prudential will determine the share, if any, of its divisible surplus allocable to the Group Contract as of each Contract Anniversary." At some point, Prudential maintained separate accounts for each Member-Insured, crediting "Paid Up Life Insurance" with a "Cash Surrender Value" to each account. The Group Contract gave Member-Insureds the right to obtain an individual insurance contract if the Group Contract was terminated.

In December 2000, Prudential approved a plan to convert from mutual ownership to stock ownership. The reorganization plan was approved by the State of New Jersey, where Prudential is domiciled. *See* Plan of Reorganization of the Prudential Ins. Co., Order No. A01-153 (N.J. Dep't of Banking & Ins. Oct. 15, 2001), http://www.state.nj.us/dobi/a01_153.htm. When the conversion occurred on December 13, 2001, Prudential's mutual insurance policies were converted to non-participating policies in the name of the new stock company. At this time, Prudential transferred to the NEA Trust $17 million in "demutualization proceeds," which Stewart describes as "the residual value of Member-Insureds' prior premium payments." Appellants' Br. at 8. The NEA Trust treated the demutualization proceeds as a general Plan asset to be used for the benefit of all Plan participants, regardless of whether they participated in the Prudential Group Contract. Because the Plan's documents did not specifically refer to the treatment of demutualization proceeds, the NEA amended the Plan Document to specify how such a transfer of money was to be treated.

Stewart sued the NEA in a putative class action on behalf of other Member-Insureds in the same Prudential life insurance program sponsored by the NEA. Stewart's basic claim was that the demutualization proceeds constituted the share of Prudential attributable to premiums from Group Contract participants and that the NEA Trust accordingly was required to distribute the funds to the individual Member-Insureds or to segregate the funds for their benefit. The NEA Trust had treated the funds as Plan assets that could be used for the benefit of Plan members not participating in the Group Contract. Stewart also claimed that the demutualization terminated the preexisting policies, triggering Member-Insureds' privilege to convert their Group Contract certificates to individual insurance contracts. In the alternative, Stewart alleged claims under ERISA, federal common law, and state law. Appended to the amended

complaint were the Group Contract, the Group Insurance Certificate, the Individual Contract Enrollment Form and Certificates, the Plan Document with its 2002 amendment, and the Trust Agreement.  Upon the NEA's motion, the district court dismissed all of Stewart's claims, ruling that ERISA applied and preempted the six state-law claims and that Stewart failed to state a claim under ERISA.  *Stewart v. Nat'l Educ. Ass'n*, 404 F. Supp. 2d 122 (D.D.C. 2005).  Stewart appeals the dismissal of the two ERISA and the state-law counts.

## II.

ERISA sets out an "interlocking, interrelated, and interdependent remedial scheme," *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985), for violations of its substantive regulatory requirements relating to employee benefit plans.  When ERISA applies, it "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a).  The district court found that it was "factually undeniable that the Group Contract and the Plan are 'employee welfare benefit plans' within the meaning of ERISA" and that each of Stewart's state-law causes of action "relate[d] to" the plan such that they were preempted by ERISA's federal causes of action.  *Stewart*, 404 F. Supp. 2d at 137-39.  On appeal, Stewart challenges whether his pleadings require the conclusion that the Group Contract is an employee benefit plan covered by ERISA.  He does not challenge whether the state-law causes of action "relate to" those plans.

We review *de novo* both the district court's statutory interpretation, *see Kaseman v. District of Columbia*, 444 F.3d 637, 640 (D.C. Cir. 2006), and its dismissal of the complaint for failure to state a cause of action, *see Barr v. Clinton*, 370 F.3d 1196, 1201 (D.C. Cir. 2004).  Of course, a complaint should not be dismissed unless the plaintiff can prove no set of facts that

would entitle the plaintiff to relief, *see Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), construing the complaint liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged, *see Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  But the court need not "accept legal conclusions cast in the form of factual allegations."  *Id.*  In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997).

ERISA "shall apply to any employee benefit plan if it is established or maintained . . . by any employee organization or organizations representing employees." 29 U.S.C. § 1003(a).  "The terms 'employee welfare benefit plan' and 'welfare plan' mean any plan, fund, or program . . . established or . . . maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise . . . benefits in the event of sickness, accident, disability, death or unemployment . . . ."  *Id*. § 1002(1).  Stewart's complaint, on its face, places the Plan, and the Group Contract, within ERISA's ambit.  He alleges that the NEA is an organization representing school teachers, that "the NEA established the Members Insurance Plan" of which the Group Contract is part, and that the NEA was "an administrator of the Plan."  This ends the matter, as the district court concluded, because Stewart has affirmatively pleaded the precise legal conclusions he must avoid for coverage under ERISA and has incorporated these allegations into each of his claims.  Similarly, because Stewart has pleaded the statutory requirements for an "employee welfare benefit plan," he is estopped from relying upon the regulatory interpretations of that same term, *see* 29 C.F.R. § 2510.3-1(j).

**III.**

Because ERISA applies, and thus preempts Stewart's state-law claims, all that remains of the complaint are two counts alleging claims under ERISA.

**A.**

Count I of the complaint, styled a "Claim for Benefits," relies on the provision that permits a "participant or beneficiary" to bring suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan," 29 U.S.C. § 1132(a)(1), or "to obtain other appropriate equitable relief . . . to enforce . . . the terms of the plan," *id.* § 1132(a)(3). Stewart alleges that the NEA failed to segregate or transfer the demutualization proceeds for the benefit of the Member-Insureds, and that it failed to provide him with "conversion privileges," i.e., the right to convert his participation in the Group Contract into an individual contract upon demutualization. In dismissing Count I, the district court relied on the principle that a plaintiff bringing an ERISA claim "must identify a specific plan term that confers the benefit in question." *Stewart*, 404 F. Supp. 2d at 130; *see Clair v. Harris Trust & Sav. Bank*, 190 F.3d 495, 497 (7th Cir. 1999). On appeal, Stewart contends that, viewed in the light most favorable to him, the Plan documents render the demutualization proceeds a benefit. Again, our review of the proper interpretation of ERISA plans is *de novo*. *Bd. of Trs. of the Hotel & Rest. Employees Local 25 v. JPR, Inc.*, 136 F.3d 794, 798 (D.C. Cir. 1998).

Although Stewart must show that "the terms of his plan" entitle him to a demutualization benefit, he does not principally rely on a specific term but instead asserts that "[i]nherent in a policy issued by a mutual company is the right to share in the

surplus of the company," Appellants' Br. at 23, and that "[p]olicies of group insurance are well known to be obtained for the benefit of the employees even though the employer, or in this case the employee organization, is designated as a policyholder," *id*. at 24-25.[1] He does identify language in the contract between the NEA Trust and Prudential establishing a "participating contract" for which Prudential would "determine the share, if any, of its divisible surplus allocable to the Group Contract" on a periodic basis. In light of his structural assumptions about mutual insurance contracts, Stewart contends that "if a policy of insurance provides such a financial interest, it is by definition a benefit." *Id*. at 24. For this general principle, Stewart refers the court to *Ruocco v. Bateman, Eichler, Hill, Richards, Inc.*, 903 F.2d 1232 (9th Cir. 1990), in which employees who had paid the entire cost of premiums for a group long-term disability policy were found entitled to the demutualization proceeds. *See id.* at 1238. However, *Ruocco* addresses a different question in a different context. As Stewart admits, *Ruocco* did not involve a claim for benefits under ERISA. Moreover, the case addressed whether the employer itself—and not a plan—could appropriate demutualization proceeds for its own benefit—and not for the benefit of plan participants. *See id.* at 1235. While *Ruocco* lends support to the

---

[1] By conceding that the NEA Trust is the contract holder, Stewart distinguishes his case from *Bank of New York v. Janowick*, Nos. 05-6390, 05-6456 (6th Cir. Nov. 22, 2006). In that case, the Sixth Circuit concluded that the employee-beneficiaries of a defunct ERISA plan had a superior claim to demutualization proceeds over the successor corporation to the employer. The holding turned on who became the contract holder of the annuities that were purchased as the plan terminated. The court, forced to choose between the employer and the employees, concluded that the employees were now the contract holders. *Id.* Here, the Plan has survived to receive Prudential's demutualization proceeds and there is no question that the NEA Trust remains the contract holder.

equitable notion that premium-paying participants deserve the proceeds of demutualization more than the sponsoring employer, it does not stand for the proposition that the premium-paying employees are entitled to the surplus more than a plan on behalf of all employees. Although it is possible that the insurance policy language taken alone might imply some individual rights, Stewart does not advance that theory and it is certainly not plainly meritorious.

Alternatively, Stewart claims that the definition of "benefit" in the Plan Document includes demutualization proceeds. The Plan Document defines a benefit as "any amount paid or payable to a participant or beneficiary in the event of death, accident, sickness, disability, or other occurrence affecting the participant or his family in accordance with the terms of any insurance policy." Stewart asks us to construe the term "occurrence" in light of the purpose of the contract, *see Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 136-37 (2d Cir. 1986), so that distributions in which Member-Insureds participate in Plan surplus are included as benefits. The district court found "occurrence" to reach only events that "physically affect an insured." *Stewart*, 404 F. Supp. 2d at 131-32. Stewart insists that because all such physical occurrences are already listed, the district court's interpretation renders the catch-all term meaningless.

More persuasively, we think, the NEA relies upon the interpretive canon of *ejusdem generis*, which "limits general terms which follow specific ones to matters similar to those specified." *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1471 (D.C. Cir. 1997) (internal quotation marks omitted); *see also Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004). The similar doctrine of *noscitur a sociis* teaches that a word is known by the company it keeps. *See Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S.

371, 372 (2003); *Babbitt v. Sweet Home Chapter of Communities for a Greater Or.*, 515 U.S. 687, 694 (1995). Here, the demutualization of the company providing the insurance contract is so obviously different in kind from the other personal events listed in the definition—death, accident, sickness, and disability—that it cannot be considered an "occurrence" leading to a "benefit" under the terms of the Plan. Although the district court's limitation may well be too narrow (as some people sensibly insure against the nonphysical occurrence of unexpected unemployment), it was correct to recognize that demutualization is simply different. The demutualization proceeds that Prudential transferred represent the capitalization of the stream of lost future dividends that were themselves clearly allocable to the NEA Trust under § 12.1 of the Plan Document. Notwithstanding Stewart's appeal to his inherent rights to mutual insurance company surplus, he cannot escape the plain language in the Plan Document and Group Contract that shows that he has not stated a claim for denial of benefits under 29 U.S.C. § 1132(a)(1)(B) by alleging that he was deprived of the demutualization proceeds.

Finally, Stewart contends that he lost the "benefit" of converting his coverage under the Group Contract to an individual insurance policy. The Group Insurance Certificate states that a Member-Insured "may convert all or part of [his] insurance . . . to an individual life insurance contract" if "[a]ll term life insurance of the Group Contract . . . ends by amendment or otherwise." The Enrollment Certificate further provides that a Member-Insured's coverage "automatically terminate[s]" when "the provisions of the Group Policy for the insurance terminate." Stewart maintains that the Group Contract terminated when Prudential demutualized. Whether the Group Contract terminated as a result of demutualization is a legal conclusion that the court need not accept. *See Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997).

According to the NEA, although demutualization extinguishes the membership rights of a policyholder (here, the NEA Trust) of the mutual company, it does not affect, much less terminate, the underlying insurance policy. Prudential's reorganization plan, as approved by New Jersey, stated that "[d]emutualization will not have any adverse result on policyholders' premiums or benefits, cash values, policy dividend eligibility or any of Prudential's other guarantees and obligations to policyholders under their policies." Plan of Reorganization of the Prudential Ins. Co., *supra*. Hence, there is no basis for Stewart's claim that his contract "terminated" as a result of the demutualization and that he is therefore entitled to convert to an individual insurance contract.

Indeed, even under Stewart's description of how demutualization affected the Group Contract, the change is not appropriately described as a "termination." The Group Contract was altered through "statutory amendment," a procedure in the Group Contract permitting "a change in the Group Contract . . . automatically made to satisfy the requirements of any state or federal law or regulation that applies to the Group Contract." On these terms, a statutory amendment represents only "a change in the Group Contract," not a "termination," which according to the Enrollment Certificate occurs only when "the provisions of the Group Policy for the insurance terminate."

**B**.

Count II of the complaint alleges that the NEA owed a fiduciary duty to the Member-Insureds and that it breached its duty. Under ERISA, fiduciaries must

> discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries; . . .

> with the care, skill, prudence, and diligence under the circumstances then prevailing [of] a prudent man . . . in accordance with the documents and instruments governing the plan.

29 U.S.C. § 1104(a)(1).  The parties agree that the NEA was a fiduciary, so only the scope of the NEA's duty remains to be resolved.  Stewart alleges that the NEA breached its duty by failing to provide the conversion privilege, by failing to segregate the demutualization proceeds for the benefit of Member-Insureds, and by amending the Plan retroactively to provide for the disposition of demutualization proceeds.  Stewart has no claim to the conversion privilege for the reasons already discussed.

To support his claim that the NEA should have segregated the demutualization proceeds for the exclusive benefit of Member-Insureds, Stewart relies upon the common law of trusts, which he claims should control in the absence of an affirmative provision dealing with demutualization proceeds.  Under the common law, he suggests, a trustee is entitled to control of an excessive res only if the settlor expressed an intent that the trustee control the excess value.  Otherwise, the money must be returned to the settlor.  This claim cannot succeed because the NEA has properly treated the demutualization proceeds as a Trust asset under the Plan Document.

The contents of the NEA Trust are defined by Section 1.9 of the Plan Document, which incorporates

> all the funds, assets, and properties, of whatever kind and from wherever derived, held by the Trustees in accordance with the Trust Agreement and this Plan, including but not limited to, contributions, insurance and reinsurance policies, insurance policy dividends

> and retrospective premium credits, . . . and all earnings and additions to the trust fund.

The demutualization benefit fits within this definition. First, because the money was transferred to the NEA pursuant to its role as policyholder of the Group Contract, these were funds derived from an insurance policy. Second, because the list is non-exhaustive, a demutualization payment should be treated in the same manner as insurance policy dividends, which are explicitly incorporated into the NEA Trust.

The Plan Document further provides that any surplus funds within the single, undifferentiated Trust Fund may be expended

> without regard to whether the surplus is applied to a benefit program which is the same as or different from the benefit program which gave rise to the surplus or whether the participants who receive any refund are the same as or other than the participants who made the contributions which gave rise to the surplus.

Thus, the Plan Document specifically contemplates the actions of the trustees here, and Stewart can state no claim for relief based on default provisions of trust law.

Stewart also claims support from an advisory opinion issued by the Department of Labor's Employee Benefits Security Administration ("DOL"). In his view, Advisory Opinion No. 2005-08A, Pens. Plan Guide (CCH) ¶ 19,990T (2005), indicates that those who pay the premiums deserve a pro rata share of the demutualization proceeds. *See also* DOL Op. No. 2001-02A, Pens. Plan Guide (CCH) ¶ 19,988N (2001). However, as the district court acknowledged, *Stewart*, 404 F. Supp. 2d at 131, DOL has distinguished only between plan assets and employer assets, not between plan assets and

segregated plan assets.

The district court also relied upon *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 442 (1999), for the proposition that "surplus returns generated by employee contributions could be applied to other employees in the plan who did not make such contributions." *Stewart*, 404 F. Supp. 2d at 133. That case considered a contributory pension plan where employees were entitled to a defined benefit. *See Hughes Aircraft*, 525 U.S. at 435 & n.1. When the plan assets quickly appreciated and created a large surplus, the employer amended the plan to allow some new employees to receive benefits out of the surplus without contributing themselves. *See id.* at 436. In rejecting the challenge to the employer's actions, the Court emphasized the difference between the defined-benefit plan it considered and a defined-contribution plan, where each beneficiary has an individual account and is entitled to the proceeds that develop therefrom. *See id.* at 439-41. Here, the Group Contract deals with insurance and not pensions, and hence the defined-contribution/defined-benefit distinction is not directly applicable. However, it is relevant to the extent that Member-Insureds pay primarily for a defined set of life insurance benefits and that the NEA Trust, rather than the Member-Insureds individually, is entitled to surplus. Nonetheless, we need not rely on *Hughes Aircraft* to resolve this claim in the NEA's favor.

Finally, Stewart contends that he has stated a claim for breach of fiduciary duty as to the NEA's retroactive amendment of the Plan Document. "Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995). Therefore, there would not normally be any appropriate objection to the NEA Trust's decision to amend the definitions of "Trust Fund" and "Surplus funds" to include demutualization proceeds

specifically. But "an amendment to any ERISA plan may not operate retroactively if that amendment deprives a beneficiary of a vested benefit." *Member Servs. Life Ins. Co. v. Am. Nat'l Bank & Trust Co. of Sapulpa*, 130 F.3d 950, 954 (10th Cir. 1997). However, Stewart claims that his right to a pro rata share of the proceeds vested when Prudential demutualized. He can point to no provision in the Plan Document or Group Contract under which Member-Insureds ever had a claim to demutualization proceeds. Therefore, Count II fails to allege facts that describe a retroactive amendment in breach of a fiduciary duty.

Accordingly, we affirm the order of the district court dismissing the complaint pursuant to Rule 12(b)(6) for failure to state a claim.