# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 1, 2023          Decided August 25, 2023

No. 22-5137

FEDERAL TRADE COMMISSION,
APPELLANT

v.

ENDO PHARMACEUTICALS INC., ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-00217)

*Mark S. Hegedus*, Attorney, Federal Trade Commission, argued the cause for appellant. With him on the briefs were *Anisha S. Dasgupta*, General Counsel, and *Joel Marcus*, Deputy General Counsel.

*George G. Gordon* argued the cause for appellees Endo Pharmaceuticals Inc., et al. With him on the brief were *Michael H. McGinley*, *Julia Chapman*, and *John P. McClam*.

*Jay P. Lefkowitz* argued the cause for appellees Impax Laboratories, LLC, et al. With him on the brief were *Devora W. Allon*, *Kevin Neylan*, and *James R.P. Hileman*. *Evelyn*

*Blacklock* entered an appearance.

Before: SRINIVASAN, *Chief Judge*, MILLETT and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* CHILDS.

CHILDS, *Circuit Judge*: The Federal Trade Commission Act, 15 U.S.C. §§ 41–58 (FTC Act), authorizes the Federal Trade Commission (the Commission) to investigate and prevent "unfair methods of competition" that affect commerce, *see id.* § 45(a)(2). In this matter, the Commission appeals the district court's dismissal of claims against pharmaceutical manufacturers for violations of §§ 1 and 2 of the Sherman Act. *Id.* §§ 1, 2. The district court dismissed the action against Appellees Endo Pharmaceuticals Inc. (Endo), its parent, Endo International plc (Endo International), Impax Laboratories, LLC (Impax), and its parent, Amneal Pharmaceuticals, Inc. (Amneal) (collectively Appellees) for failure to state a claim because a single patentee granting an exclusive license is conduct protected and allowed under the Patent Act. 35 U.S.C. § 261; *see FTC v. Endo Pharms. Inc.*, 596 F. Supp. 3d 115, 125–30 (D.D.C. 2022). For the reasons that follow, we affirm the district court's dismissal of the Commission's claims.

**I.**

Congress has the power "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. Pursuant to that authority, Congress enacted the Patent Act that, *inter alia*, grants patentees a twenty-year "right to exclude others from making, using, offering for sale, or selling the[ir] invention," 35 U.S.C. § 154(a)(1), and the ability to "grant and

convey an exclusive right under [their] application for patent, or patents, to the whole or any specified part of the United States," *id.* § 261.

Nearly a century later, Congress enacted the Sherman Act. Section 1 declares as illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Section 1 is interpreted to outlaw "unreasonable restraints" on trade. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)) (formatting modified). To plead a claim under § 1, a plaintiff must allege: (1) the existence of an agreement; and (2) that the agreement unreasonably restrains trade. *See Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190 (2010) (citations omitted).

Section 2 of the Sherman Act declares it a felony for a person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. To plead a claim under § 2, a plaintiff must allege: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966).

## II.

Because this case arises on a motion to dismiss, the following background is derived from the Commission's complaint and the documents it incorporates by reference. *See Lewis v. Mutond*, 918 F.3d 142, 144 (D.C. Cir. 2019) (citing *Scandinavian Satellite Sys., AS v. Prime TV Ltd.*, 291 F.3d 839,

844 (D.C. Cir. 2002)); *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

Endo develops, manufactures, markets, and distributes prescription pharmaceutical products. It holds several patents covering a long-acting or extended-release (ER) version of the semi-synthetic opioid oxymorphone sold under the brand name Opana ER. Oxymorphone provides "relief of moderate to severe pain in patients requiring continuous, around-the-clock opioid treatment for an extended period of time." Compl. ¶ 18 (J.A. 19).

In 2006, Endo began selling Opana ER and continued to sell the drug until 2017 with success. In its inaugural year, Opana ER generated revenues of less than $7 million. That increased to $384 million in 2011, and $159 million in 2016.

In 2007, Impax decided to market its own generic version of Opana ER and sought approval from the Federal Drug Administration (FDA). In its Abbreviated New Drug Application to the FDA, Impax certified that its generic drug would not infringe on Endo's Opana ER patents and that Endo's patents were invalid. *See Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1305 (D.C. Cir. 2010) ("After a new drug hits the market, [prospective generic competitors] can effectively challenge the brand maker . . . by filing a certification that a proposed generic version of the brand drug would not run afoul of one (or more) of the . . . blocking patents, either because the patent is invalid or because the generic maker has found a way to design around it." (citation omitted)). Endo responded to Impax's FDA certification by filing a patent infringement action in January 2008.

After two and a half years of litigation, Endo and Impax settled their patent infringement action (the 2010 Agreement).

That agreement did three things of note. First, Impax agreed that it would not sell its generic Opana ER until a "Commencement Date" in January 2013. 2010 Agreement § 3.2 (J.A. 49). Second, the Agreement conveyed a license from Endo to Impax to cover all of Endo's patents involved in manufacturing, selling, and marketing of generic Opana ER, including patents acquired after the agreement became effective. *Id.* § 4.1(a) (J.A. 51). Finally, after the expiration of an "Exclusivity Period," the 2010 Agreement contemplated that Impax and Endo would "negotiate in good faith an amendment to the terms of the License to any patents which issue from any Pending Applications." *Id.* § 4.1(d) (J.A. 53).

Starting in 2012, purportedly to prevent abuse of Opana ER, Endo launched a replacement "crush resistant" Reformulated Opana ER, which would not be covered by its agreement with Impax and stopped selling Opana ER. Also, beginning in 2012, "Endo developed or acquired the rights to several additional patents related to Opana ER," Compl. ¶ 44 (J.A. 24), and began asserting its patent rights against other generic oxymorphone sellers, *id.* ¶ 49 (J.A. 24).

In 2013, in accordance with the 2010 Agreement, Impax started selling its generic ER version of oxymorphone. Impax's generic oxymorphone helped create a competitive environment that lowered the price of ER oxymorphone. After successfully obtaining injunctions in patent infringement cases it litigated, Endo was left with only Impax as a competitor legally capable of selling generic oxymorphone ER.

In October 2015, Endo asked Impax to pay an eighty-five percent royalty on the license for additional Opana ER patents. When Impax refused this request, Endo sued Impax for breach of the 2010 Agreement. While litigation with Impax was ongoing, Endo faced FDA scrutiny because of new information

that linked Reformulated Opana ER to intravenous drug abuse and Endo decided to remove the drug from the market. A few months later, after unsuccessfully attempting to get the contract action dismissed, Impax reached a settlement with Endo (the 2017 Agreement) which "clarifie[d]" Impax's license to all of Endo's Opana ER patents in exchange for a monetary payment in addition to a percentage of royalties relating to Impax's gross oxymorphone ER profits. Compl. ¶ 92 (J.A. 33). Impax and Endo also agreed that Impax's obligation to pay royalties would terminate if Endo took various actions, such as using its own patents to enter the oxymorphone ER market. Considering those terms, the district court found that Impax had functionally "paid Endo for the exclusive right to use the patent licenses for oxymorphone ER," and that even if the terms of the agreement left room for an "option to compete," the Commission had "plausibly alleged an exclusive licensing agreement and a patent monopoly." *Endo Pharms. Inc.*, 596 F. Supp. 3d at 123–24 (capitalization altered).

With the 2017 Agreement, Endo tabled a possible relaunch of Opana ER and closed the door on any potential plans to license its oxymorphone ER patents to any other companies. After Endo's market exit, there was an increase in the average price of a 40 mg tablet of oxymorphone ER. Compl. ¶ 106 (J.A. 35). In light of these results, the Commission determined that the 2017 Agreement was anticompetitive and harmful to consumers and filed a complaint for injunctive and other equitable relief against Appellees. The Commission alleged that (1) Appellees' 2017 Agreement violated § 1 of the Sherman Act and it constituted an unfair method of competition in violation of § 5(a) of the FTC Act, 15 U.S.C. § 45(a); and that (2) Amneal exercised monopoly power in violation of § 2 of the Sherman Act and § 5(a) of the FTC Act. Appellees moved to dismiss the Commission's complaint for failure to state a claim. Endo International also moved to

dismiss for lack of personal jurisdiction. The district court dismissed the action, without addressing the jurisdictional issue. *Endo Pharms. Inc.*, 596 F. Supp. 3d at 130.

The Commission timely appealed.

**III.**

**A.**

First, we answer whether this court has appellate jurisdiction over this appeal. We conclude that we do.

On August 16, 2022, while this appeal was pending, Endo, Endo International, and their affiliated companies filed a voluntary petition for bankruptcy under Title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532, in the United States Bankruptcy Court for the Southern District of New York. *See In re Endo Int'l plc*, No. 22-22549-jlg (Bankr. S.D.N.Y. Aug. 16, 2022). After Endo filed a notice of suggestion of bankruptcy and automatic stay of proceedings, *see FTC v. Endo. Pharms. Inc.*, No. 22-5137, Doc. No. 1959770 (D.C. Cir. filed Aug. 17, 2022), this court ordered the parties to "address in their briefs whether [it] had jurisdiction over this appeal." *Id.* at Doc. No. 1970176 (D.C. Cir. filed Oct. 24, 2022). While Endo did not take a position regarding "the applicability of the Bankruptcy Code's automatic stay to the instant appeal," Endo Br. 1 n.1, both the Commission and Impax contend that this court has jurisdiction pursuant to the government action or regulatory power exception to the Bankruptcy Code's automatic stay provision. Impax Br. 44; Comm'n Br. 22–23.

A party's filing for bankruptcy generally triggers an automatic stay of any "commencement or continuation . . . of a

judicial . . . proceeding against the debtor." 11 U.S.C. § 362(a)(1). If it applies, the automatic stay strips this court of jurisdiction. *In re Kupperstein*, 994 F.3d 673, 677 (1st Cir. 2021) ("[T]he stay forbids judicial proceedings against the debtor to progress."); *Chao v. Hospital Staffing Servs., Inc.*, 270 F.3d 374, 382 (6th Cir. 2001). "But Congress excluded certain actions from the automatic stay, including actions by 'a governmental unit' intended 'to enforce such governmental unit's . . . police and regulatory power.'" *Wallaesa v. FAA*, 824 F.3d 1071, 1076 n.3 (D.C. Cir. 2016) (quoting 11 U.S.C. § 362(b)(4)). "To determine if the regulatory power exception applies, we evaluate whether the government's action is to effectuate a 'public policy' or to further its own 'pecuniary interest.'" *In re Kupperstein*, 994 F.3d at 677 (citations omitted); *see also* 11 U.S.C. § 362(b)(4). "If 'the governmental action is designed primarily to protect the public safety and welfare,' then it passes the 'public policy' test and is excepted from the automatic stay." *In re Kupperstein*, 994 F.3d at 677 (internal quotation marks and citation omitted). "In contrast, if the government is attempting to proceed against the debtor for a 'pecuniary purpose,' that is, 'to recover property from the estate,' the police power exception offers no shelter and the proceeding is stayed." *Id.* at 678 (citation omitted).

The Commission initiated the instant litigation "to prevent unfair methods of competition," Compl. 1 (J.A. 14), which it is authorized to do if the competition is against public policy, *see Butterick Pub. Co. v. FTC*, 85 F.2d 522, 526 (2d Cir. 1936) (citing *FTC v. Klesner*, 280 U.S. 19 (1929)). *See also Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1525 (2019) ("'[P]rotecting consumers from monopoly prices' has been 'the central concern of antitrust.'" (quoting 2A Areeda & Hovenkamp § 345)). In addition, the Commission is not requesting monetary relief. Based on the Commission's express purpose for this

litigation, we conclude that the regulatory power exception to the automatic stay is applicable to this proceeding.

**B.**

We next consider whether the district court erred in dismissing the Commission's claims. We conclude that it did not.

The court reviews de novo the district court's dismissal for failure to state a claim upon which relief can be granted. *See Stewart v. Nat'l Educ. Ass'n*, 471 F.3d 169, 173 (D.C. Cir. 2006) (citing *Barr v. Clinton*, 370 F.3d 1196, 1201 (D.C. Cir. 2004)).

"To survive a motion to dismiss, a complaint must have 'facial plausibility,' meaning it must 'plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In evaluating a Rule 12(b)(6) motion, the Court must construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'" *Id.* (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)). "Factual allegations, although assumed to be true, must still 'be enough to raise a right to relief above the speculative level.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "But the Court need not accept inferences drawn by plaintiff if those inferences are not supported by the facts set out in the complaint, nor must the court accept legal conclusions cast as factual allegations." *Id.* (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

In its complaint, the Commission alleged that Endo and Impax, through their 2017 Agreement, violated Sherman Act §§ 1 and 2 by creating an impermissibly anticompetitive exclusive licensing arrangement, which resulted in the monopolization of profits and denial of the benefits of competition to consumers. Now on appeal, the Commission argues that it sufficiently pleaded violations of §§ 1 and 2 of the Sherman Act because it alleged that Impax had sufficient market power, and that the 2017 Agreement harms competition by removing a market competitor, causing the loss of price competition, and reducing innovation. Endo responds that the district court's decision to dismiss the Commission's Sherman Act claims should be affirmed because the Commission failed to allege conduct exceeding the scope of what the Patent Act authorizes thereby making antitrust scrutiny unwarranted. Impax agrees with Endo stating that affirmance of the district court is required because the law allows a single patentee and its single licensee to agree to allocate exclusively the benefits of valid and repeatedly tested patent rights that are owned by the single patentee.

The Commission's claims necessitate that we again consider the interplay between two distinct federal statutory schemes: the Patent Act's protections for creativity and the Sherman Act's pro-competition and antitrust regulation.

The Supreme Court has long recognized that certain exercises of patent rights are lawful despite the Sherman Act's dictates. For example, the "owner of a patent may assign it to another and convey . . . the exclusive right to make, use, and vend the invention." *United States v. Gen. Elec. Co.*, 272 U.S. 476, 489 (1926). Short of assignment, a patent owner may also "grant a license to make, use, and vend articles under the specifications of his patent for any royalty, or upon any condition the performance of which is reasonably within the

reward which the patentee by the grant of the patent is entitled to secure." *Id.* Since its decision in *General Electric*, the Supreme Court has continued to emphasize that "[t]here is nothing unlawful in the requirement that a licensee should pay a royalty to compensate the patentee for the invention and the use of the patent." *United States v. Line Material Co.*, 333 U.S. 287, 315 (1948). As a result, patent owners can place conditions on a licensee's sale of the patented product, "provided the conditions of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly." *Id.* at 299 (quoting *Gen. Elec.*, 272 U.S. at 490).

Accordingly, we have previously recognized in a similar situation that "the protection of patent laws and the coverage of the antitrust laws are not separate issues." *United States v. Studiengesellschaft Kohle, m.b.H.*, 670 F.2d 1122, 1128 (D.C. Cir. 1981) (citation omitted). Our decision in *Studiengesellschaft Kohle* recognized the legality of standard exclusive licensing agreements: "A patentee may grant one exclusive license," which "is an agreement by the patentee, usually for a consideration, not to sue the licensee of the patent for infringement of the patent." *Id.* at 1127 (citations omitted). "Frequently, a patentee grants licenses on certain conditions, in addition to the requirement that the licensee pay royalties." *Id.*

Upon consideration of the aforementioned law, the resolution of this dispute turns on the answer to a single question: Does a valid patent holder's grant of a nearly exclusive license to a single potential competitor in exchange for royalty payments violate antitrust law when that nearly exclusive license restrains trade only to an extent traditionally recognized by patent law as reasonable? We think not.

After *Studiengesellschaft Kohle*, the Supreme Court weighed in on patent agreements in *FTC v. Actavis, Inc.*, a

matter involving a reverse payment settlement wherein the patentee "pa[id] the alleged infringer, rather than the other way around." 570 U.S. 136, 141 (2013). The Court held that, when a complaint alleges that a patent holder has violated the antitrust laws, courts must strike a balance "between the lawful restraint on trade of the patent monopoly and the illegal restraint prohibited broadly by the Sherman Act." *Id.* at 148 (quoting *Line Material Co.*, 333 U.S. at 310). If Congress has already struck that balance in the Patent Act by "'specifically giv[ing] a right' to restrain competition in the manner challenged," or where the Supreme Court has "previously approved as reasonable" a given practice, we must defer to those judgments. *Id.* (quoting *Line Material Co.*, 333 U.S. at 311).

But while *Actavis* held that the unexplained "reverse payment" at issue in that case was subject to antitrust scrutiny, it did not disturb the long-standing principle that a single patentee may set conditions in granting a single licensee the right to use its valid patents. *See id.* at 150. And here, unlike in *Actavis*, the Patent Act expressly authorizes behavior that closely resembles the 2017 Agreement, permitting a patent owner to "grant and convey an exclusive right under his . . . patents." 35 U.S.C. § 261. Consistent with the Patent Act, the Court's holding in *Actavis* acknowledged the accepted understanding that a patent holder's grant of an exclusive license to a potential competitor in exchange for payment of a royalty generally raises no issue under the antitrust laws. In this regard, the Commission does not offer any support for its assertion that an exclusive licensing agreement is different if the parties are potential competitors. That, after all, describes the facts of *General Electric*, 272 U.S. at 489, by which we remain bound, *see Actavis*, 570 U.S. at 150.

In this appeal, the Commission contends that the 2017 Agreement is not a standard exclusive licensing agreement because the 2010 Agreement had already given Impax a license to Endo's present and future patents. Therefore, the 2017 Agreement was instead an agreement not to compete.

As an initial matter, the Patent Act defines a licensing agreement as one conveying a "right under . . . [the] patent." 35 U.S.C. § 261. Here, because of Endo's victory at the motion-to-dismiss stage of its infringement suit against Impax, Endo had such a right to convey—namely, the right to practice its patents unclouded by a plausible claim for infringement backed by the threat of treble damages. *See Endo Pharms., Inc. v. Impax Lab'ys, Inc.*, No. 16-2526, 2016 WL 6246773, at *5 (D.N.J. Oct. 25, 2016); *see also Alfred E. Mann Found. for Sci. Rsch. v. Cochlear Corp.*, 604 F.3d 1354, 1360–1361 (Fed. Cir. 2010) (The most important of the "rights available under the patent" in determining ownership is "[f]requently . . . a right to sue accused infringers.").

However, even if the Commission's characterization of the 2010 Agreement is correct, the Commission fails to explain how the 2017 Agreement—the agreement it now challenges—meaningfully differs from a standard exclusive license. The Commission's complaint and briefing suggested that the meaningful difference stems from the parties' prior 2010 Agreement, under which Endo granted Impax a non-exclusive license to produce a generic alternative to Opana ER. But the Commission's complaint offers no evidence or reasoning from which to conclude that this otherwise permissible exclusive license somehow became impermissible if it was preceded by a non-exclusive license like the one conferred by the 2010 Agreement, especially since the 2017 Agreement appears to have been a straightforward and bona-fide settlement of ongoing litigation.

Indeed, the Commission admitted that its challenge to the 2017 Agreement would remain the same even if the prior 2010 Agreement had never existed. *See* Oral Arg. 20:23–22:5. That concession all but confirms that the subject of the Commission's challenge is to the 2017 Agreement alone—an agreement that is legally indistinguishable from (and technically less restrictive than) a standard exclusive license. Moreover, in the absence of any allegations of antitrust harms extending beyond those explicitly sanctioned by Congress in the Patent Act and by the Supreme Court in *Actavis*, there is no basis on which to find Sherman Act liability on this record.[1]

As a result, with or without the 2010 Agreement, the viability of the Commission's Sherman Act claims depends on the sufficiency of allegations regarding the 2017 Agreement. But beyond failing to distinguish the 2017 Agreement from a standard exclusive license, the Commission has not pointed to any aspect of the Endo-Impax settlement that might justify further antitrust scrutiny. For example, the Commission has not alleged that the 2017 Agreement was an "unusual" settlement in which Endo paid Impax to drop a legitimate challenge against potentially weak or invalid patents. *See Actavis*, 570 U.S. at 147–48 ("The FTC alleges that in substance, the plaintiff agreed to pay the defendants many

---

[1] Even though the Commission believes that its allegations are similar to an agreement condemned by the Supreme Court, *see* Comm'n Br. 28–29, this case is distinguishable from *Palmer v. BRG of Georgia*, 498 U.S. 46 (1990), in which an exclusive licensing agreement was a pretext for a noncompete agreement between two competitors, because the parties in *Palmer* did not require one another's intellectual property to participate in the market for bar preparation courses. Here, by contrast, Impax's ability to compete was completely contingent on the clarity of its license to use Endo's patents, and the complaint itself alleges that Endo surrendered the right to press its suit against Impax through the 2017 Agreement.

millions of dollars to stay out of its market, even though the defendants did not have any claim that the plaintiff was liable to them for damages. That form of settlement is unusual."). Nor has the Commission alleged that the 2017 Agreement gave Endo undue economic power to control a different market beyond the one it already controlled through its patents. *Cf. United States v. New Wrinkle, Inc.*, 342 U.S. 371, 380 (1952) (invalidating a scheme in which multiple patent holders "pool[ed] their patents" to "fix prices on . . . products for themselves and their licensees"); *Line Material Co.*, 333 U.S. at 314–15 (finding concerted action by multiple patentees to "join in an agreement . . . to maintain prices on their several products" to be "unlawful per se under the Sherman Act"). These examples, of course, are merely illustrative; as *Actavis* cautions, "presumptive rules" would be inappropriate in this context. *See* 570 U.S. at 159. In a future case, the Commission is free to plead that a licensing agreement results in unjustifiable competitive harms, so long as it explains how those harms exceed what the Patent Act and settled precedent permit, which it has failed to do here.

In sum, we reason that the Commission's complaint lacks allegations establishing that the 2017 Agreement created anticompetitive effects greater than that authorized by settled law and precedent. Neither precedent nor the Commission's allegations permit this court to conclude that the 2017 Agreement meaningfully differs from a standard exclusive license, which both the Supreme Court and the Patent Act have blessed as lawful. *See Line Material Co.*, 333 U.S. at 308 ("During its term, a valid patent excludes all except its owner from the use of the protected process or product. This monopoly may be enjoyed exclusively by the patentee or he may assign the patent 'or any interest therein' to others." (citations omitted)). Therefore, the Commission's Sherman

Act claims are appropriately dismissed for failure to state a claim.

**C.**

In its opinion, the district court acknowledged, but did not rule on Endo International's contention that any claim against it should be dismissed for lack of personal jurisdiction. *See Endo Pharms. Inc.*, 596 F. Supp. 3d at 120 (citation omitted). Normally, we would consider this error because "when personal jurisdiction is in question, a court must first determine that it possesses personal jurisdiction over the defendants before it can address the merits of a claim." *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 510 (D.C. Cir. 2018); *see Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007). But personal jurisdiction can be waived and there is a question of whether Endo International properly preserved the issue for appeal. *See Shatsky v. PLO*, 955 F.3d 1016, 1032 (D.C. Cir. 2020) (Personal jurisdiction "is both forfeitable and waivable." (citation omitted)); *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 32–3 (D.C. Cir. 1990) ("[P]ersonal jurisdiction and venue, can be waived at any stage of a proceeding and ordinarily are waived by failure to take a cross-appeal." (citation omitted)); *see also Inc. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982).

Two aspects of the record counsel against granting any form of relief on the personal jurisdiction question. First, Endo International failed to either file a cross-appeal challenging the district court's exercise of personal jurisdiction or identify "exceptional circumstances" to excuse that failure. *Shatsky*, 955 F.3d at 1028 ("When . . . the district court rejects a defendant's claim that the court lacks personal jurisdiction, but then rules in the defendant's favor on the merits, the defendant

generally must take a cross-appeal to preserve the personal jurisdiction objection." (citation omitted)); *see also id.* at 1030 ("[W]e will excuse compliance with the cross-appeal rule only in "exceptional circumstances." (citation omitted)).  Second, Endo International repeatedly requests affirmance of the district court's order, *see* Endo Br. 3, 15, 37, but "if we conclude that the district court lacked personal jurisdiction, we must vacate—not affirm—its judgment on the merits." *Shatsky*, 955 F.3d at 1029 (citation omitted).  Considering all of these circumstances, we find that Endo International waived any objection to personal jurisdiction.

*****

For the foregoing reasons, we affirm the judgment of the district court dismissing the Commission's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

*So ordered.*